**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

KROMA MAKEUP EU, LTD.,

      Plaintiff,

v.                                    Case No:  6:14-cv-1551-Orl-40GJK

BOLDFACE LICENSING +
BRANDING, INC., et al.,

      Defendants.

_____

## <u>ORDER</u>

This cause comes before the Court on the following:

1. Defendant By Lee Tillett, Inc.'s Motion to Dismiss With Prejudice Count VI of Plaintiff's Complaint and Incorporated Memorandum of Law (Doc. 14), filed November 17, 2014;

2. Plaintiff Kroma Makeup EU, LLC's Response in Opposition to Defendant By Lee Tillett, Inc.'s Motion to Dismiss (Doc. 22), filed December 15, 2014;

3. Defendants Kim Kardashian, Kourtney Kardashian, and Khloe Kardashian's Motion to Dismiss for Lack of Subject Matter Jurisdiction or Alternatively, for Failure to State a Claim (Doc. 33), filed January 21, 2015;

4. Plaintiff Kroma Makeup EU, LLC's Response in Opposition to Kardashian Defendants' Motion to Dismiss (Doc. 35), filed February 4, 2015;

5. The Kardashian Defendants' Reply Memorandum in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction or Alternatively, for Failure to State a Claim (Doc. 43), filed February 25, 2015; and

6.   Plaintiff Kroma Makeup EU, LLC's Surreply in Opposition to the Kardashian

Defendants' Motion to Dismiss (Doc. 48), filed March 10, 2015.

## I.   INTRODUCTION

This trademark dispute tests the extraterritorial reach of the Lanham Act by presenting a situation in which a foreign licensee of a registered U.S. trademark sues U.S. citizens for their alleged infringement of the trademark abroad.  The foreign licensee additionally sues its licensor for refusing to share in the proceeds of a settlement of a separate lawsuit regarding the same infringing conduct.  The Court ultimately concludes that it has subject matter jurisdiction over all of the foreign licensee's trademark claims and that the Lanham Act reaches the Defendants' infringing conduct abroad, allowing the foreign licensee to state claims under its provisions.  The Court additionally concludes that, although the foreign licensee cannot state a claim for promissory estoppel against its licensor under Florida law, the foreign licensee may proceed against the licensor under a breach of contract theory.

## II.   FACTUAL BACKGROUND[1]

### A.   History of Kroma

Defendant, By Lee Tillett, Inc. ("Tillett"), is a domestic corporation incorporated under the laws of Florida.  (Doc. ¶ 4).  Tillett owns a registered U.S. trademark in "Kroma," which Tillett has continuously used in commerce since 2004 as a premium, all-natural

---

[1]   This account of the facts is taken from Plaintiff's Complaint (Doc. 1), the allegations of which the Court must accept as true in considering Defendants' respective motions to dismiss.  *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983).

makeup brand.  (*Id.* ¶ 9).  Kroma products sell from between $19 and $100 and have been featured at high-profile fashion events throughout the United States and the world, including the Oscars and the Emmys.  (*Id.*).

Plaintiff, Kroma Makeup EU, Ltd. ("Kroma EU") is a foreign corporation incorporated under the laws of the United Kingdom.  (*Id.* ¶ 3).  In October 2012, Tillett granted an exclusive license to Kroma EU to import, sell, and distribute Kroma products in the European Union and to use the "Kroma" mark in furtherance of its business.  (*Id.* ¶¶ 10–12).  As part of the license agreement, Tillett guaranteed that it owned the "Kroma" mark and promised to provide Kroma EU with evidence that "Kroma" was registered in the United Kingdom.  (*Id.*).  By late 2012, Kroma EU's business was thriving, with Kroma EU negotiating to place Kroma products in a number of upscale British and European retail stores.  (*Id.* ¶ 14).

### B.  Creation of Khroma and its Release into Commerce

In 2011, Defendants, Kim Kardashian, Kourtney Kardashian, and Khloe Kardashian (together, the "Kardashian Defendants"),[2] became interested in creating a Kardashian-backed makeup line and approached various companies about launching their endeavor.  (*Id.* ¶ 17).  The Kardashian Defendants ultimately selected Defendant, Boldface Licensing + Branding, Inc. ("Boldface"),[3] to spearhead the venture.  (*Id.* ¶¶ 18–19).  To that end, the Kardashian Defendants entered into a licensing agreement with Boldface to create and develop their makeup brand.  (*Id.* ¶ 19).  The licensing agreement provided that the Kardashian Defendants held final decision making authority regarding

---

[2]   The Kardashian Defendants are California residents.  (Doc. 1, ¶¶ 6–8).
[3]   Boldface is a Nevada corporation with headquarters located in California.  (*Id.* ¶ 5).

the brand and would receive a royalty based on the sale of their makeup products.  (*Id.* ¶¶ 20, 23, 88).

Before selecting a name for the makeup brand, Boldface conducted a preliminary trademark search for terms such as "Khroma" and "Kardashian Khroma."  (*Id.* ¶ 21). Boldface subsequently presented these designations to the Kardashian Defendants as possible brand names, despite their conflict with "Kroma" in the preliminary trademark search.  (*Id.* ¶¶ 21–22).  The Kardashian Defendants also inquired into the propriety of using "Khroma" when it became unclear whether they could purchase or use the "Kroma" mark.  (*Id.* ¶ 24).  Nevertheless, the Kardashian Defendants chose "Khroma" and submitted applications to the United States Patent and Trademark Office ("USPTO") to protect "Khroma" and other similarly-named marks.  (*Id.* ¶ 26).  The USPTO ultimately refused to register any mark containing the word "Khroma," stating that it was likely to create consumer confusion with "Kroma."  (*Id.* ¶ 30).

In June 2012, Tillett learned that Boldface intended to release a makeup line sponsored by the Kardashian Defendants named "Khroma."  (*Id.* ¶ 27).  Tillett sent a cease and desist letter to Boldface demanding that Boldface stop using the name "Khroma."  (*Id.* ¶ 28).  Boldface responded by denying any infringement and indicating that it would not discuss the matter further.  (*Id.*).  On October 26, 2012, Tillett sent a second cease and desist letter to Boldface, again demanding that Boldface discontinue its use of "Khroma."  (*Id.* ¶ 32).

In November 2012, Boldface and the Kardashian Defendants released Khroma into stores throughout the United States and Europe.  (*Id.* ¶¶ 43, 45).  Khroma was also sold globally through various websites. (*Id.* ¶ 45).  Khroma products were priced between

$6 and $20 and were of inferior quality compared to Kroma.  (*Id.* ¶ 46).  Consequently, Kroma suffered severe consumer confusion with Khroma, resulting in the perception that Kroma products were associated with the Kardashian Defendants and were of the same inferior quality as Khroma.  (*Id.* ¶¶ 47–50).

### C.   The California Litigation and the Falling Out Between Tillett and Kroma EU

On November 30, 2012, Boldface sued Tillett in a California federal court to seek a declaration that Boldface did not infringe on "Kroma" (hereinafter, the "California litigation").  (*Id.* ¶ 52).  Tillett countersued Boldface for trademark infringement and filed third party claims against the Kardashian Defendants for vicarious trademark infringement.  (*Id.* ¶ 53).  On March 11, 2013, the district court entered a preliminary injunction finding that "Khroma" was confusingly similar to "Kroma."  (*Id.* ¶¶ 58–59).  Tillett eventually settled with Boldface and the Kardashian Defendants and the California litigation was dismissed with prejudice.  (*Id.* ¶ 68).  Importantly, Kroma EU was not named as a party in the California litigation and did not participate in settlement negotiations.  (*Id.* ¶ 70).

Prior to settlement, Tillett, through its attorney, promised to seek damages on Kroma EU's behalf.  (*Id.* ¶ 33).  Tillett requested information from Kroma EU regarding its claimed damages in order to include in a demand for settlement to Boldface and the Kardashian Defendants.  (*Id.* ¶¶ 34–35 & n.6).  Tillett's attorney kept Kroma EU abreast of all settlement talks and assured Kroma EU that Tillett would continue to act in Kroma EU's best interests throughout negotiations.  (*Id.* ¶ 38).

Upon winning its motion for preliminary injunction, however, Tillett abandoned Kroma EU's interests in pursuing settlement, informing Kroma EU that any recovery would inure solely to Tillett.  (*Id.* ¶ 62).  Tillett and its attorney thereafter refused all further substantive communication with Kroma EU.  (*Id.*).  As a result, Tillett's settlement of the California litigation with Boldface and the Kardashian Defendants did not include a release of any claims to which Kroma EU was entitled.  (*Id.* ¶ 70).

### D.   The Instant Case

On September 24, 2014, Kroma EU initiated this lawsuit against Tillett, Boldface, and the Kardashian Defendants by filing a seven-count complaint.  (Doc. 1).  Counts I and II allege trademark infringement under § 43(a) of the Lanham Act and common law trademark infringement, respectively, against Boldface.  (*Id.* ¶¶ 71–85).  Counts III, IV, and V, allege vicarious trademark infringement against each of the Kardashian Defendants based on their control over Boldface.  (*Id.* ¶¶ 86–102).  As to these five trademark infringement claims, Kroma EU alleges that Boldface and the Kardashian Defendants infringed on the "Kroma" mark by using "Khroma" in Europe.  Count VI alleges promissory estoppel against Tillett.  (*Id.* ¶¶ 103–11).  Finally, Count VII alleges tortious interference against Boldface.  (*Id.* ¶¶ 112–17).  On February 5, 2015, the Clerk of Court defaulted Boldface.  (Doc. 37).

The remaining defendants now move to dismiss the Complaint.  The Kardashian Defendants move to dismiss Counts III, IV, and V for lack of subject matter jurisdiction or, in the alternative, for failing to state claims upon which relief can be granted.  Specifically, the Kardashian Defendants contend that the Lanham Act does not reach extraterritorial infringement such as what Kroma EU alleges here.  (Doc. 33).  Tillett moves to dismiss

Count VI for failing to state a claim for promissory estoppel.  (Doc. 14).  Both motions are ripe for consideration.

## III.   ISSUES PRESENTED

Based on the arguments contained within the parties' respective filings, the Court finds itself confronted with the following issues:

1.  Whether Kroma EU has standing to bring its claims for trademark infringement and vicarious trademark infringement;

2.  Whether Kroma EU's trademark claims are barred by res judicata;

3.  Whether the Lanham Act reaches the Kardashian Defendants' infringing conduct occurring outside the United States, allowing Kroma EU to state claims for vicarious trademark infringement; and

4.  Whether Kroma EU states a claim for promissory estoppel against Tillett.

## IV.   DISCUSSION

District courts must address jurisdictional questions before reaching the sufficiency of the complaint.  *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1242 (11th Cir. 1998), *cert. denied* 528 U.S. 930 (1999).  Although no party directly attacks Kroma EU's standing to bring its trademark infringement claims, the Kardashian Defendants allude to the issue by stating in their motion to dismiss that Kroma EU has no interest in the "Kroma" trademark.  (Doc. 33, p. 10).  The Kardashian Defendants also suggest that Kroma EU's claims might be barred by res judicata.  (*Id.* at pp. 10–11).  Because questions involving standing and res judicata create uncertainty over a federal court's jurisdiction to hear the matter, the Court must satisfy itself that neither doctrine prevents

Kroma EU from bringing this lawsuit before turning to the merits of the parties' motions to dismiss.[4]

### A. Kroma EU's Foundation to Assert Trademark and Vicarious Trademark Claims[5]

In their motion to dismiss, the Kardashian Defendants hint that Kroma EU lacks standing to bring its vicarious trademark infringement claims.  (Doc. 33, p. 10).  The Kardashian Defendants reason that because Tillett is the registrant and owner of the "Kroma" mark in the United States, Tillett is the only one who can prosecute claims on the mark's behalf.  (*Id.*; Doc. 43, p. 2).  Consequently, the Kardashian Defendants believe that Kroma EU must be attempting to enforce its interests in either a registered or an unregistered foreign trademark, both of which the Kardashian Defendants contend lie outside the scope of the Lanham Act.  (Doc. 33, pp. 2–3; Doc. 43, pp. 1–2).

Standing to bring and maintain a lawsuit is fundamental to invoking a federal court's subject matter jurisdiction.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–42 (2006).  "The party invoking federal jurisdiction bears the burden of proving standing."

---

[4]   Although the Clerk of Court has defaulted Boldface and Boldface has failed to otherwise appear in these proceedings, the Court is obligated to ensure that it has subject matter jurisdiction over Kroma EU's claims against it as well.  *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001) (advising federal courts to examine subject matter jurisdiction at any point during the litigation when doubt arises).

[5]   The Court begins by noting that the analysis of a common law trademark infringement claim is the same as under the Lanham Act.  *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1218 (S.D. Fla. 2004) (citing *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792 (11th Cir. 2003) (per curiam)); *cf.* Fla. Stat. § 495.181 (providing that construction of the Lanham Act is persuasive in analyzing a Florida trademark infringement claim).  Therefore, although the Court will primarily refer to the Lanham Act and cite authority which examines the Lanham Act throughout this Order, the Court applies these principles equally to Kroma EU's common law trademark infringement claim against Boldface.

*Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000).   At the pleadings stage, general factual allegations which show that the plaintiff has standing are sufficient to meet this burden.  *See id.*

It is well-settled that a plaintiff suing under the Lanham Act "must have rights in the name at issue to seek protection."  *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1412 (11th Cir. 1998).  Both the Lanham Act and the common law recognize the right of a trademark owner to license the use of the mark by another so long as the licensor adequately polices the mark.[6]  *See Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519 (11th Cir. 1992).  A licensee's use of the mark inures to the benefit of the licensor, fortifying the strength of the mark.  15 U.S.C. § 1055; *accord* Restatement (Third) of Unfair Competition § 33 (1995).  Like any license, the licensor of a trademark transfers less than his whole ownership interest in the mark to the licensee.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1076 (5th Cir. 1997), *cert. denied* 522 U.S. 915 (1997).  Therefore, by taking a license, the licensee necessarily acknowledges that it has no ownership interest in the trademark, but has the right to use the mark with the licensor-owner's permission.  *See A & L Labs., Inc. v. Bou-Matic LLC*, 429 F.3d 775, 781 (8th Cir. 2005).

However, simply because the licensor remains the owner of the trademark does not mean that he is the only person with rights in the mark to enforce.  Although § 32(1)

---

[6]   Policing a trademark means that the licensor adequately controls the quality of goods and services produced by the licensee and warrants that these goods and services conform to the quality expected by the public of the mark.  *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519–20 (11th Cir. 1992).  Failure to police a mark may result in that mark's cancellation.  *Id.*

of the Lanham Act speaks of the "registrant" who may bring an action for trademark infringement, *see* 15 U.S.C. § 1114(1), section 43(a)—the provision through which Kroma EU asserts its infringement claims—is not so limited in scope.  Specifically, § 43(a) permits "any person who believes that he or she is or is likely to be damaged" to bring a claim for infringement resulting from false association or false advertising.  15 U.S.C. § 1125(a)(1).  Section 43(a) therefore affords relief to any plaintiff who shows the requisite injury from the defendant's infringing conduct, without regard to any ownership interest the plaintiff may have in the trademark.  *Murphy v. Provident Mut. Life Ins. Co. of Phila.*, 756 F. Supp. 83, 86 (D. Conn. 1990) ("[T]he question of ownership is immaterial to standing under § 43(a) . . . ."), *aff'd* 923 F.2d 923 (2d Cir. 1990), *cert. denied* 502 U.S. 814 (1991).    Indeed, courts frequently find non-owners—such as manufacturers, competitors, distributors, and others—to have standing under § 43(a).  *See, e.g.*, *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594 (4th Cir. 1992) (trade association has standing), *cert. denied* 506 U.S. 862 (1992); *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 160 (1st Cir. 1977) (non-exclusive distributor has standing).

Despite the seemingly unbridled breadth of § 43(a)'s standing-to-sue allowance, it is not without bound.  The United States Supreme Court recently resolved a split among the circuit courts on the question of non-owner standing in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).  There, the Supreme Court held that a non-owner manufacturer of goods had standing to sue under § 43(a).  *Id.* at 1395.  In doing so, the Supreme Court provided the framework for determining whether a non-owner plaintiff has standing to raise a claim under § 43(a).

The Supreme Court began its analysis in *Lexmark* by reciting Article III's well-known constitutional standing requirement:   "The plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision."  *Id.* at 1386 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Constitutional standing not being disputed in *Lexmark*, the Supreme Court then turned to formulate a second, two-pronged standing inquiry—which the Court labeled "statutory standing"—to apply when analyzing any federal statute, including the Lanham Act.[7]  *Id.* at 1386–91.

Under statutory standing, the plaintiff must first fall within the "zone of interests" of the statute or statutory provision asserted.  *Id.* at 1388.  The determination of whether a plaintiff falls within a statute's zone of interests is generally "a straightforward question of statutory interpretation," requiring courts to look toward the statute's purpose where that purpose is unambiguous.  *See id.*  Upon reading the purpose of the Lanham Act, the Supreme Court identified § 43(a)'s zone of interests as protecting persons engaged in commerce.  *Id.* at 1389–90.  The *Lexmark* Court specifically drew a distinction between those who have legitimate commercial interests at stake and others, such as consumers, who have merely been "hoodwinked" by an infringer's conduct.  *Id.* at 1390.  While the latter group may have suffered a true injury-in-fact sufficient to satisfy Article III, these

---

[7]   To characterize the Supreme Court's announcement of a statutory standing requirement as new or novel would not be entirely accurate.  Writing for a unanimous Supreme Court, Justice Scalia illuminated that statutory standing is more of a refinement to what federal courts have called "prudential standing" over the years. *See Lexmark*, 134 S. Ct. at 1386–87.

plaintiffs fall outside of the Lanham Act's purpose in protecting commercial actors.  *Id.*
The Supreme Court therefore concluded that a plaintiff must demonstrate a cognizable
"commercial interest in reputation or sales" to fall within § 43(a)'s zone of interests.  *Id.* at
1389–90.

The second prong of statutory standing requires the plaintiff to demonstrate that
his injuries were proximately caused by the defendant's wrongful conduct.  *Id.* at 1390.
Embodying the centuries-old common law rule, "the proximate-cause requirement
generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful
conduct."  *Id.*  In the context of claims brought under § 43(a), the Supreme Court opined
that "a competitor who is forced out of business by a defendant's false advertising" will
generally show proximate cause, but that third parties who suffer injury from the
competitor's inability to meet financial obligations because of the defendant's false
advertising would fail the proximate cause prong.  *Id.* at 1391.

As a preliminary matter, the Kardashian Defendants misconceive the nature of
Kroma EU's interest in the "Kroma" mark.  Although the Kardashian Defendants believe
Kroma EU is attempting to enforce a foreign trademark in a U.S. court (Doc. 33, p. 11;
Doc. 43, pp. 1–2), Kroma EU shows that it is actually a licensee of the U.S. registered
"Kroma" mark (Doc. 1, ¶¶ 10–12; Doc. 35, p. 10 & n.3).  As such, Kroma EU seeks to
enforce its rights in a domestic trademark.

Regarding standing, Kroma EU clearly satisfies the constitutional requirements of
Article III.  Kroma EU shows that it has suffered concrete and particularized injuries in the
form of lost revenue, lost business, and association with an inferior-quality product
(Doc. 1, ¶¶ 49–51) and that these injuries are fairly traceable to the conduct at issue—

the rollout of Khroma in Europe (*id.* ¶¶ 43–46).  A favorable judicial decision in the form of monetary damages would compensate Kroma EU for these injuries.

Kroma EU additionally satisfies statutory standing under § 43(a).  First, Kroma EU falls within the zone of interests protected by the Lanham Act.  During the period in dispute, Kroma EU held an exclusive license to import and distribute Kroma products in the European Union and to utilize the "Kroma" mark in furtherance of those commercial activities.  (*Id.* ¶¶ 11–12, 69).  Further, Kroma EU specifies actual commercial conduct it engaged in to promote the Kroma brand and product line abroad, such as selling more Kroma products in Europe than Tillett had in the United States and negotiating the placement of Kroma makeup with high-end British retailers.  (*Id.* ¶ 14).  Indeed, Kroma EU is exactly the type of commercial actor who § 43(a) of the Lanham Act envisions protecting.

Second, Kroma EU shows that its injuries were proximately caused by the infringing conduct of Boldface and the Kardashian Defendants.  Strikingly similar to the hypothetical posed by the Supreme Court in *Lexmark*, Kroma EU competed with Boldface and the Kardashian Defendants in Europe.  (*See id.* ¶¶ 43–50).  With the launch of Khroma (despite their knowledge of Kroma), Boldface and the Kardashian Defendants intentionally created consumer confusion with "Kroma," resulting in Kroma EU losing significant business and revenue.  (*Id.*).  Kroma EU therefore easily satisfies the proximate cause prong.  Accordingly, the Court concludes that Kroma EU has alleged sufficient facts to carry its burden of establishing standing at the pleadings stage.

**B.      Glossing Over Kroma EU in the California Litigation**

Next, the Kardashian Defendants imply that Kroma EU's trademark infringement claims may be barred by res judicata.  The Kardashian Defendants submit that "the United States courts have already exhausted their jurisdiction over this dispute" by entertaining the California litigation.  (Doc. 33, p. 11).  In that case, Tillett countersued Boldface and the Kardashian Defendants for trademark infringement, sought damages emanating from their infringing conduct in Europe, and ultimately settled its claims with these defendants. (*Id.*).  The California litigation was thereafter dismissed with prejudice.  (*Id.*).

The doctrine of res judicata bars subsequent litigation where four elements are met: "(1) the prior decision was rendered by a court of competent jurisdiction; (2) there was a final judgment on the merits; (3) the parties were identical in both suits; and (4) the prior and present causes of action are the same." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1187 (11th Cir. 2003) (internal quotation marks omitted), *cert. denied* 540 U.S. 1016 (2003).  The California litigation involved Boldface suing Tillett, Tillett countersuing Boldface, and Tillett filing third party claims against the Kardashian Defendants.  (Doc. 1, ¶¶ 52–53).  Kroma EU was never a party to the California litigation.  (*Id.* ¶ 70).  Further, no party to this case indicates that the settlement agreement among Tillett, Boldface, and the Kardashian Defendants settled, waived, or released any claims Kroma EU might have had in the California litigation.  (*See id.*).  For these reasons, the parties in the two lawsuits are not identical and Kroma EU's trademark infringement claims in this case are not barred by res judicata.

**C.      The Palette of Extraterritorial Conduct Reached by the Lanham Act**

Being satisfied that Kroma EU has met its burden of establishing federal subject matter jurisdiction, the Court turns to the Kardashian Defendants' motion to dismiss.  The Kardashian Defendants ask the Court to dismiss Kroma EU's vicarious trademark infringement claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or, alternatively, for failing to state claims upon which relief can be granted under Rule 12(b)(6).  The Kardashian Defendants state that Kroma EU does not allege sufficient conduct to invoke the Lanham Act's protections.  (Doc. 33, pp. 7–12; Doc. 43, pp. 2–5).

Motions made pursuant to Rule 12(b)(1) challenge a district court's subject matter jurisdiction to consider the case at bar.  As the Kardashian Defendants correctly note in their motion to dismiss, however, a defendant who challenges a complaint based on the conduct it alleges raises a merits issue, not a jurisdictional issue.  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010).  Indeed, the Court derives its subject matter jurisdiction over Counts III, IV, and V not from the diversity of the parties or Kroma EU's allegations of international misconduct, but from the fact that a trademark is the subject of the dispute.  15 U.S.C. § 1121(a); 28 U.S.C. § 1338(a).  Because the Kardashian Defendants challenge the Complaint based on the conduct alleged by Kroma EU, the Court must analyze the Kardashian Defendants' motion to dismiss pursuant to the standards of Rule 12(b)(6).  *See Morrison*, 561 U.S. at 254.

To that end, Rule 12(b)(6) requires a complaint to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  A claim is plausible on its face when the plaintiff alleges enough facts that "allow[] the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Mere legal conclusions or recitation of the elements of a claim are not enough.  *Twombly*, 550 U.S. at 555.  District courts must accept all well-pleaded allegations within the complaint as true.  *Id.*  Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor.  *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994) (per curiam).

Here, the parties essentially agree on the law to be applied.  Where trademark infringement occurs primarily in a foreign nation, the extraterritorial reach of the Lanham Act becomes a concern, as it is presumed that Congress intends to legislate "with respect to domestic, not foreign matters."  *Morrison*, 561 U.S. at 255.  Only Congress' clear, affirmative expression of its intent to give a federal statute extraterritorial consequence can rebut this presumption.  *Id.*

The United States Supreme Court found such an intent in the Lanham Act in *Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952).  In *Bulova Watch*, the Supreme Court recognized Congress' undeniable ability to "project the impact of its laws beyond the territorial boundaries of the United States."  *Id.* at 282.  Upon reviewing the Lanham Act's purpose and statement of broad jurisdictional scope, the Supreme Court deduced that the Lanham Act regulates not only domestic conduct, but also foreign conduct of U.S. citizens where the conduct involves U.S. commerce and does not otherwise interfere with the rights of foreign nationals in their own countries.  *Id.* at 285–86.

The Eleventh Circuit has since distilled the Supreme Court's holding in *Bulova Watch* to require an analysis of three factors to determine whether a claim involving

foreign infringing activity is governed by the Lanham Act: (1) whether the defendant is a U.S. citizen, (2) whether the foreign conduct had a substantial effect on U.S. commerce, and (3) whether adjudicating the claim would interfere with another nation's sovereignty. *See Int'l Café, S.A.L. v. Hard Rock Café Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001) (per curiam); *accord Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 642–43 (2d Cir. 1956), *cert. denied* 352 U.S. 871 (1956).  The absence of one factor is not necessarily dispositive, but "the absence of [two] is certainly fatal" to a plaintiff's trademark infringement claim.  *Int'l Café*, 252 F.3d at 1278 (quoting *Vanity Fair*, 234 F.2d at 643) (internal quotation marks omitted).

Where the parties quarrel, of course, is the application of these three factors to the instant case.  The Kardashian Defendants contend that the Lanham Act does not extend to protect purely foreign acts of trademark infringement like that alleged by Kroma EU. Although the Kardashian Defendants recognize that they are all United States citizens, they maintain that the Complaint fails the remaining two *International Café* factors.  First, because all of the alleged conduct occurred outside the United States, Kroma EU cannot allege a substantial effect on U.S. commerce.  (Doc. 33, pp. 10–11; Doc. 43, pp. 3–5). Second, allowing Kroma EU to proceed on its claims would interfere with the sovereignty of the United Kingdom and the European Union, as Kroma EU's trademark interests are based under the laws of each entity and all of the alleged infringement occurred within these entities' respective territorial boundaries.  (Doc. 33, pp. 11–12, Doc. 43, p. 5).

Kroma EU disputes the Kardashian Defendants' reasoning on both fronts. Moreover, Kroma EU submits that the Kardashian Defendants' status as United States

citizens is the most significant *International Café* factor, warranting heavier consideration. (Doc. 35, p. 6).  The Court discusses the three factors in order.

### 1.    The Kardashian Defendants are U.S. Citizens

Although there is no dispute that the Kardashian Defendants are U.S. citizens, the Court briefly notes the relevance of their citizenship.  Where the Lanham Act is concerned, a defendant's status as a U.S. citizen is meaningful in determining whether to provide extraterritorial application because U.S. citizens should not be allowed to "evade the thrust of the laws of the United States in a privileged sanctuary beyond our borders." *Bulova Watch*, 344 U.S. at 287.  For this reason, some courts characterize U.S. citizenship as the paramount factor supporting a conclusion that the Lanham Act should be applied to foreign conduct.  *See, e.g.*, *McBee v. Delica Co., Ltd.*, 417 F.3d 107, 111 (1st Cir. 2005); *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 955 F. Supp. 220, 227 (S.D.N.Y. 1997) (stating as dicta that U.S. citizenship is "the most significant factor" to consider), *aff'd* 152 F.3d 948, Nos. 97-1125, 97-1281, 97-1282, 1998 WL 169251 (Fed. Cir. Apr. 13, 1998) (per curiam) (unpublished opinion), *cert. denied* 525 U.S. 948 (1998). With this consideration in mind, the Court finds that the first *International Café* factor weighs in favor of allowing Kroma EU to proceed under the Lanham Act.

### 2.    Kroma EU Alleges Conduct Having a Substantial Effect on U.S. Commerce

Whether a defendant's foreign conduct substantially affects U.S. commerce is an intensely fact-sensitive question.[8]  Although case law in the Eleventh Circuit discussing

---

[8]  Despite the Kardashian Defendants' vigorous argument that this factor weighs against allowing Kroma EU to proceed with its claims, they offer no authority in support of their position.  (*See* Docs. 33, 43).

the question is sparse, a survey of those federal courts employing the substantial effect test yields two significant factors to consider, both of which are present in this case.

First, where the defendant's foreign conduct creates confusion among American consumers, there is little doubt about a substantial effect on U.S. commerce.  American consumer confusion usually occurs in the context of intentionally importing infringing goods into the United States or where the foreign infringing goods seep into U.S. commerce through third parties.  *See, e.g.*, *Bulova Watch*, 344 U.S. at 286 (finding sufficient effects on U.S. commerce where infringing watches sold exclusively in Mexico filtered into Texas); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1006 (2d Cir. 1997) (finding that the importation of infringing products "clearly has substantial impact on United States commerce").  Due to the Lanham Act's ardent protection of American consumers from the deceptive or misleading use of trademarks by others, courts frequently give American consumer confusion heavy consideration; indeed, this factor can be sufficient by itself to find a substantial effect on U.S. commerce.  *See, e.g.*, *Rodgers v. Wright*, 544 F. Supp. 2d 302, 315 (S.D.N.Y. 2008) ("[I]t is well-settled that the Lanham Act applies to an American defendant's foreign infringement where that infringement results in a likelihood of a confusion of American consumers . . . ."); *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 170 (S.D.N.Y. 1998) ("A substantial effect on United States commerce clearly exists where a defendant's conduct results in consumer confusion . . . in the United States.").

Although the vast majority of federal courts focus strictly on confusion to American consumers, on at least one occasion, the Eleventh Circuit has approved of a more expansive view that the Lanham Act also protects non-American consumers from

confusion created by American infringers.  In *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161 (11th Cir. 1994) (per curiam), the Eleventh Circuit affirmed the district court's extraterritorial application of the Lanham Act where a U.S. corporation purchased infringing cordless telephones from a manufacturer in Korea to sell exclusively to consumers in South America.  In extending the Lanham Act's coverage to the defendant's foreign conduct, the district court specifically observed that "the Lanham Act imposes . . . the duty to protect the entire gamut of purchasers, including non-English speaking purchasers, in various countries throughout the world to which the defendants intend to export their products."  *Id.* at 1180 (quoting *Reebok Int'l Ltd. v. Am. Sales Corp.*, 11 U.S.P.Q.2d 1229, at *2 (C.D. Cal. 1989)) (internal quotation marks omitted).  However, it is clear that, unlike a showing of American consumer confusion, global consumer confusion is insufficient by itself to sustain a finding of a substantial effect; there must be other connections to U.S. commerce.[9]

Second, a defendant's significant commercial activity within the United States to advance its infringing conduct abroad will establish a substantial effect on U.S. commerce.  For example, in *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982 (11th Cir. 1995), the Eleventh Circuit found a sufficient impact on U.S. commerce where, although the infringing activity occurred in Europe, significant steps were taken in the United States to facilitate the infringement.  The Eleventh Circuit was particularly

---

[9]   For example, and as will be discussed shortly, the district court in *Babbit* additionally relied on the defendant's use of a U.S. foreign trade zone as a conduit for shipping the infringing goods from Korea to South America.  *Babbitt Elecs., Inc. v. Dynascan Corp.*, 828 F. Supp. 944, 956 (S.D. Fla. 1993), *aff'd* 38 F.3d 1161 (11th Cir. 1994) (per curiam).

persuaded by the fact that the infringing goods were produced in the United States, the defendant negotiated and contracted in the United States for the sale of those goods abroad, and at least some of the goods were transported through the United States en route to Europe.  *Id.* at 985; *see also, e.g.*, *Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n*, 701 F.2d 408, 414–15 (5th Cir. 1983) (finding a sufficient impact on U.S. commerce where, although all infringing conduct occurred in Saudi Arabia, the defendant processed, packaged, and transported the infringing goods within the United States); *Babbitt Elecs., Inc. v. Dynascan Corp.*, 828 F. Supp. 944, 956 (S.D. Fla. 1993) (finding a sufficient impact on U.S. commerce where the defendant shipped its infringing goods through a U.S. foreign trade zone), *aff'd* 38 F.3d 1161 (11th Cir. 1994) (per curiam).

Conversely, where the defendant's commercial activities within the United States are only slight or are unrelated to the foreign infringing activity, there is usually no substantial effect on U.S. commerce.  *See, e.g.*, *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 311 (4th Cir. 2012) (per curiam) (declining to extend Lanham Act protection over purely foreign infringement where foreign corporate defendant "lack[ed] a pervasive system of domestic operations"), *cert. denied* 133 S. Ct. 846 (2013); *Southco, Inc. v. Fivetech Tech. Inc.*, 982 F. Supp. 2d 507, 513 (E.D. Penn. 2013) (finding no substantial effect on U.S. commerce where the only evidence of domestic activity was a single, isolated sale of the infringing good), *aff'd* No. 2014-1390, 2015 WL 1609846 (Fed. Cir. Apr. 10, 2015); *Hong Leong Fin. Ltd. (Singapore) v. Pinnacle Performance Ltd.*, No. 12 Civ. 6010(JMF), 2013 WL 5746126, at *5 (S.D.N.Y. Oct. 23, 2013) (finding no substantial effect on U.S. commerce where the

defendant's domestic activities were wholly unrelated to the infringing activity committed abroad).

Applying these two factors to the instant case, the Court finds that the Kardashian Defendants' conduct has had a substantial effect on U.S. commerce.  Kroma EU more than adequately demonstrates global consumer confusion.  Kroma EU was in the process of placing Kroma in 172 European stores managed by a high-end British retailer.  (*Id.* ¶ 48).  When Khroma was released in Europe, the retailer backed out, stating that it did not want to be associated with the Kardashian Defendants or to be perceived as selling discount or inferior-quality products.  (*Id.* ¶ 49).  Other potential clients also expressed their confusion as to why Kroma was partnering with the Kardashian Defendants.  (*Id.* ¶ 50).

Although Kroma EU stops short of directly describing any American consumer confusion, the Court can reasonably infer from the Complaint's factual allegations that Kroma EU suffered consumer confusion in the United States as well.  The infringing Khroma products were sold globally through Internet retailers such as Amazon, eBay, and Khroma's U.S. and European-based websites (which, as it happens, use URLs resembling those used by Kroma).[10]  (*Id.* ¶ 45).  Because of Khroma's pervasive Internet presence around the world, the Court can reasonably infer that some American consumers intending to purchase Kroma products were confused into purchasing deeply discounted European Khroma products through the European websites and that, much like the spurious watches in *Bulova Watch*, these infringing makeup products seeped

---

[10]  Kroma EU states that Kroma uses kromamakeup.com and kromamakeup.eu, while Khroma uses khromabeauty.com and khromabeauty.eu.  (Doc. 1, ¶ 45 & n.7).

back into the United States.  *See Bulova Watch*, 344 U.S. at 286.

Moreover, Kroma EU alleges significant commercial conduct by the Kardashian Defendants within the United States to further their infringing activities in Europe.  The Kardashian Defendants, who are U.S. citizens, engaged Boldface, a U.S. corporation, to create, market, and manufacture the Khroma makeup line.  (Doc. 1, ¶¶ 17–19).  The Kardashian Defendants exerted considerable control over all aspects of the Khroma brand from within the United States, including designing the Khroma logo and packaging (*id.* ¶ 23 & n.3), selecting the Khroma name (*id.* ¶¶ 22–23 & nn. 2–3), marketing the brand through their personal celebrity (*id.* ¶¶ 40–41, 44), and defining the brand's overall vision (id. ¶ 42).  The Kardashian Defendants oversaw the release of Khroma into thousands of U.S. retailers and utilized U.S. commerce to transport Khroma products to retailers in Europe.  (*Id.* ¶¶ 44–45).  Like the defendant in *Levi*, the Kardashian Defendants conducted all business activities regarding the infringing European Khroma products from within the United States and with the indispensable and inescapable aid of U.S. commerce.  *See Levi*, 51 F.3d at 985.

As a final consideration, it appears that the federal courts are driven most to answer the substantial effect question in a manner that safeguards the public policy concerns behind the Lanham Act—namely, protecting consumers from unscrupulous competitors who commandeer a source-identifying mark and guaranteeing that those who hold rights in a trademark "reap the financial, reputation-related rewards associated with a desirable product."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) (internal quotation marks omitted); *see also McBee*, 417 F.3d at 121 ("The goal of

the [substantial effects] test is to ensure that the United States has a sufficient interest in the litigation, as measured by the interests protected by the Lanham Act . . . .").

The Court finds that the policies underlying the Lanham Act are best served by finding that the Kardashian Defendants' foreign conduct has had a substantial effect on U.S. commerce.  Kroma EU alleges that the Kardashian Defendants were well-aware of the "Kroma" mark prior to Khroma's release into commerce and that they were unable to purchase the "Kroma" name from Tillett.  (Doc. 1, ¶¶ 21–22, 24).  Further, the USPTO rejected the Kardashian Defendants' attempts to trademark "Khroma" and other similar names, advising that "Khroma" conflicted with "Kroma" and would likely lead to consumer confusion.  (*Id.* ¶¶ 26, 30).  The Kardashian Defendants disregarded these warnings and released Khroma anyways.  (*Id.* ¶¶ 31, 39).  Should the allegations in the Complaint prove true, the Lanham Act should provide the remedy, as U.S. trademark law has a considerable interest in protecting U.S. trademarks regardless of where an American infringer's conduct occurs.

Because Kroma EU alleges sufficient facts showing American as well as global consumer confusion, because the Kardashian Defendants operated the Khroma business entirely from within the United States, and because public policy demands it, the substantial effect on U.S. commerce factor weighs in favor of allowing Kroma EU to assert its trademark infringement claims under the Lanham Act.

### 3.    Enforcing Kroma EU's Interest in the Trademark Would Not Interfere with Another Nation's Sovereignty

A trademark infringement claim will generally interfere with the sovereignty of another nation where the parties are engaged in parallel litigation within the foreign nation

or where the foreign nation takes action against the interest which the plaintiff seeks to assert in the United States court.  For example, in *International Café*, the Eleventh Circuit was confronted with a Lebanese corporation that owned a registered Lebanese trademark.  *Int'l Café*, 252 F.3d at 1276.  The appellate court ultimately found interference with the sovereignty of Lebanon because civil lawsuits involving the disputed trademark remained pending there.  *Id.* at 1279.  Because a ruling by a U.S. court would interfere with an inconsistent ruling from a Lebanese court, allowing the plaintiff to proceed under the Lanham Act was inappropriate.  *Id.*; *cf. Bulova Watch*, 344 U.S. at 289 (finding no interference with Mexico's sovereignty where the Mexican courts had ended all proceedings against the trademark).

The Kardashian Defendants do not contend that any parallel litigation over "Kroma" is occurring elsewhere or that a foreign nation has acted against the disputed trademark.  In fact, the Kardashian Defendants generally misunderstand the substance of the interference factor, essentially rehashing their argument regarding Kroma EU's standing to maintain this lawsuit; that is, the Kardashian Defendants claim that Kroma EU fails the interference factor because Kroma EU holds no interest in the "Kroma" mark within the United States.  (Doc. 33, pp. 11–12; Doc. 43, p. 5).  For the reasons discussed earlier in Section IV.A, *supra*, the Kardashian Defendants' assertions about Kroma EU's lack of interest in a U.S. trademark are incorrect.

Moreover, the Court is unable to find any other reason to support the notion that allowing Kroma EU to proceed under the Lanham Act would impugn the sovereignty of another country.  Unlike the plaintiff in *International Café*, Kroma EU is not the owner of a foreign registered trademark, but rather the licensee of a U.S. registered trademark.

That U.S. trademark was used in the United States and the United States has the greatest interest in enforcing that mark with regard to the conduct alleged.

Accordingly, all three *International Café* factors weigh in favor of allowing Kroma EU to proceed on its vicarious trademark infringement claims against the Kardashian Defendants under the Lanham Act.  The Kardashian Defendants' motion to dismiss will be denied.

### D.    The Face Underneath Kroma EU's Promissory Estoppel Claim

Lastly, the Court turns to Tillett's motion to dismiss.  Tillett moves to dismiss Count VI of the Complaint—Kroma EU's state law promissory estoppel claim—pursuant to Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim upon which relief can be granted.  The Court therefore analyzes the promissory estoppel claim under the *Iqbal*/*Twombly* pleading requirements described in Section IV.C, *supra*.

The Court has subject matter jurisdiction over Kroma EU's state law promissory estoppel claim due to the parties' diversity of citizenship; Tillett is a Florida corporation, Kroma EU is a citizen of a foreign country, and the amount in controversy exceeds the jurisdictional threshold.  *See* 28 U.S.C. § 1332(a)(2).  A federal court sitting in diversity applies the substantive law of the state in which the case arose.  *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1132–33 (11th Cir. 2010).  Kroma EU and Tillett agree that Kroma EU's promissory estoppel claim arose in Florida.

In order to state a claim for promissory estoppel in Florida, a plaintiff must establish three elements: (1) the plaintiff relied to its detriment on a promise made by the defendant, (2) the defendant should have reasonably expected the plaintiff to rely on the promise, and (3) injustice can be avoided only by enforcing the promise.  *W.R. Townsend*

*Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 302 (Fla. Dist. Ct. App. 1999).   However, it is well-settled in Florida that enforcement of a promise through promissory estoppel is not available where a written contract exists between the parties covering the topic in dispute.   *Univ. of Miami v. Intuitive Surgical, Inc.*, 166 F. App'x 450, 454 (11th Cir. 2006) (per curiam) (citing *Advanced Mktg. Sys. Corp. v. ZK Yacht Sales*, 830 So. 2d 924, 928 (Fla. Dist. Ct. App. 2002)).   The reasoning is intuitive: using promissory estoppel to sidestep the terms of a bargained-for agreement "would wreak havoc with basic contract law" and would render it "extremely difficult for parties to fully understand or be advised of their rights and obligations under written contracts."   *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 925 (Fla. 1989).

In this case, Kroma EU represents that it entered into an exclusive licensing contract with Tillett for the use of the "Kroma" trademark in Europe.   (Doc. 1, ¶¶ 10–12, n.4).   All exclusive trademark licensing contracts provide as a matter of law that the licensor is "under an implied good faith obligation not to do anything that would impair or destroy the value of [the] exclusive licensee's rights."   *Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc.*, 911 F.2d 1548, 1550 (11th Cir. 1990) (internal quotation marks omitted) (subsequent history omitted); *cf. Zim v. W. Publ'g Co.*, 573 F.2d 1318, 1324 (5th Cir. 1978)[11] (imputing an implied obligation of good faith and fair dealing into all contractual relationships).   This implied good faith obligation has been specifically held to require a licensor to share its proceeds from the settlement of a trademark infringement

---

[11]  In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit that were handed down prior to October 1, 1981.

action with its exclusive licensee where the exclusive licensee can show its damages. *Original Appalachian Artworks*, 911 F.2d at 1551–52.  Indeed, the basis of Kroma EU's promissory estoppel claim against Tillett is that Tillett promised to seek damages on behalf of Kroma EU from Boldface and the Kardashian Defendants for their infringing conduct abroad in the California litigation, but later reneged.  (Doc. 1, ¶¶ 33–34, 38, 62–67).  Because Kroma EU's claim is grounded in its contractual relationship with Tillett and contract law can adequately fashion an appropriate remedy, promissory estoppel is not available as a form of relief.

Nevertheless, the Court is not bound by the labels or legal theories on which a plaintiff relies in stating a claim for relief.  The federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted," but only require that the plaintiff allege sufficient facts to notify the defendant of its basis for the lawsuit.  *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2014) (per curiam); *see also* C. Wright & A. Miller, 5 Federal Practice & Procedure § 1219 (3d ed. 2002) ("The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief.") (footnotes omitted).  To that end, the Court finds that Kroma EU's factual allegations clearly set forth a claim for breach of contract against Tillett.

In order to state a claim for breach of contract in Florida, a plaintiff must establish three elements: (1) the existence of a valid contract, (2) a material breach, and (3) damages resulting from the breach.  *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006), *review denied* 962 So. 2d 335 (Fla. 2007).  A complaint need not allege an offer, acceptance, consideration, or a meeting of the minds, but may instead

generally allege the existence of a valid contract.  *See Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008), *review denied* 23 So. 3d 711 (Fla. 2009).

As alluded to above, Kroma EU and Tillett entered into an exclusive licensing contract for the use of the "Kroma" trademark in Europe.  (Doc. 1, ¶¶ 10–12, n.4). Because exclusive trademark licensing contracts contain an implied obligation of good faith on the part of the licensor to share with its licensee the proceeds from a settlement of an infringement claim, Kroma EU alleges the breach of the licensing contract when it describes Tillett's refusal to share in its settlement of the California litigation.  (*Id.* ¶¶ 33– 34, 38, 62–67).  As a result of Tillett's refusal to share in these settlement proceeds, Kroma EU states that it has suffered damages.  (*Id.* ¶¶ 70, 109–10).  Accordingly, the Court will allow Kroma EU to proceed on Count VI of the Complaint under a breach of contract theory.  Tillett's motion to dismiss will therefore be denied.

As a final matter, when a court construes a plaintiff's claim for relief differently than how the plaintiff may have originally intended, it is best to invite the plaintiff to amend its claim to add any factual allegations it may deem appropriate.  *See Johnson*, 135 S. Ct. at 347.  The Court will give Kroma EU an opportunity to do so upon its filing of a timely motion.

## V.   CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendant By Lee Tillett, Inc.'s Motion to Dismiss With Prejudice Count VI of Plaintiff's Complaint and Incorporated Memorandum of Law (Doc. 14) is **DENIED**.

2.  Defendants Kim Kardashian, Kourtney Kardashian, and Khloe Kardashian's Motion to Dismiss for Lack of Subject Matter Jurisdiction or Alternatively, for Failure to State a Claim (Doc. 33) is **DENIED**.

3.  Defendants Kim Kardashian, Kourtney Kardashian, and Khloe Kardashian shall answer Plaintiff's Complaint **on or before May 7, 2015**.

4.  Should Plaintiff wish to amend Count VI of its Complaint to more clearly allege a claim for breach of contract, Plaintiff shall file a motion to amend Count VI **on or before April 23, 2015**.

5.  If Plaintiff does not file a motion to amend within the time provided, Defendant By Lee Tillett, Inc., shall answer Plaintiff's Complaint **on or before May 7, 2015**.

**DONE AND ORDERED** in Orlando, Florida on April 15, 2015.

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record