# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

KROMA MAKEUP EU, LLC., a United
Kingdom Limited Liability Company,

      Plaintiff,

   vs.

BOLDFACE LICENSING + BRANDING,
INC., a Nevada Corporation,
KIM KARDASHIAN, a California resident,
KOURTNEY KARDASHIAN, a California
resident, and KHLOE KARDASHIAN, a
California resident, and BY LEE TILLETT,
INC., a Florida Corporation,

      Defendants.

CASE NO.: 6:14-CV-01551-PGB-GJK

**DISPOSITIVE MOTION**

## DEFENDANTS KIM KARDASHIAN, KOURTNEY KARDASHIAN, AND KHLOE KARDASHIAN'S MOTION FOR SUMMARY JUDGMENT, FED. R. CIV. P. 56(a), AND MEMORANDUM OF LAW

COME NOW, the Defendants, KIM KARDASHIAN, KOURTNEY KARDASHIAN, and KHLOE KARDASHIAN, by and through their undersigned counsel, and hereby file this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(a) on the grounds set forth below.

## MEMORANDUM OF LAW

### I.    INTRODUCTION

Plaintiff Kroma Makeup EU, LLC ("Kroma EU") was formerly the exclusive licensee of the registered trademark KROMA for use in Europe in connection with cosmetics—until the mark's owner, Defendant By Lee Tillett, Inc. ("Tillett"), terminated the license for a litany of material contract breaches. In this action, Kroma EU alleges that Defendants Kim, Kourtney, and Khloe Kardashian (the "Kardashians") infringed the KROMA trademark during the brief pendency of Kroma EU's license by endorsing of a line of "Khroma" cosmetics sold by Defendant Boldface Licensing + Branding, Inc. ("Boldface"). These are the *same* trademark claims that Tillett asserted successfully in a prior action in the Central District of California, where Tillett obtained an injunction against and settlement payment from Boldface. Although Kroma EU's duplicative claims survived a motion to dismiss where the Court was bound to accept as true its allegations, the claims cannot survive summary judgment, where the Court looks beyond the four corners of the complaint. Indisputable evidence not previously before the Court demonstrates that Kroma EU lacks standing to pursue infringement claims under the terms of its now-terminated license with Tillett, and that its claims are further barred by the doctrine of nonparty claim preclusion.

It is settled law under Section 43(a) of the Lanham Act that a trademark licensee's "standing to sue depends largely on the rights granted to the licensee under the licensing agreement." *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1279 (S.D. Fla. 2013). License agreements are commonly drafted to vest trademark owners/licensors with the exclusive authority to police their mark, so that the mark holder can control the litigation of matters that affect the validity, strength, and reputation of the mark. Where licenses contain such restrictions, courts invariably hold that the licensee lacks standing to bring its own infringement claims. Kroma EU's license agreement—the terms of which were not before the Court at the pleading stage—is one such license. The agreement provides that Kroma EU's sole right and obligation regarding the enforcement of the KROMA mark is "to inform [Tillett] of any illegal use of the trademark in the sales Territory." At that point, it is Tillett alone who "undertakes … to protect

[the mark] properly from any attempts of illegal use." If Kroma EU suffers monetary damages due to infringement of the KROMA mark, the license agreement "contractually obligated [Tillett] to hold KROMA EU harmless against damages arising out of [the] infringement." (Compl. ¶ 33 n.4.) Tillett's principal, Aglaia Lee Tillett, confirms in her Declaration that the license agreement was drafted to reserve to Tillett the exclusive right to sue for infringement of the its KROMA mark, and that the agreement does not allow Kroma EU to file its own infringement claims. As a result, Kroma EU's claims fail as a matter of law for lack of standing. (*See infra* pp. 11-16.)

Even if Kroma EU has standing, its claims are barred by the final judgment and dismissal in Tillett's prior action under a sub-doctrine of res judicata known as "nonparty claim preclusion." Although Kroma EU was not a party to Tillett's suit against Boldface and the Kardashians, it is well-established that "a nonparty is bound by a judgment if he was in privity with a party to that judgment." *McCulley v. Bank of America, N.A.*, 605 Fed. Appx. 875, 877 (11th Cir. 2015). The Supreme Court in *Taylor v. Sturgell*, 553 U.S. 880, 893, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008) identified six distinct circumstances in which nonparty preclusion will be found. Two apply here to compel a finding of privity: the existence of a "substantive legal relationship" between Kroma EU and Tillett, and the "adequate representation" of Kroma EU's interests by Tillett.

As shown in the supporting evidence, the license agreement between these parties *required* Tillett to pursue claims against Boldface and the Kardashians on Kroma EU's behalf, and Tillett *did so*. The complaint in this action confirms that "legal work on behalf of TILLETT [was] protecting the rights of KROMA UK (as is plainly required by TILLETT pursuant to the agreement of the parties)." (Compl. ¶ 55.) Expecting and believing that Tillett was protecting its rights, Kroma EU participated extensively in the California proceeding: It provided Tillett with information for use in settlement, and it provided a critical Declaration supporting Tillett's successful motion for preliminary injunction. Emails from Kroma EU's owner and principal, Jeannette "Jay" Willey ("Willey"), evidence that she viewed Tillett's lawsuit as *her own* suit, and Tillett's settlement negotiations as *her own* negotiations.

Under *Taylor*, a finding of privity is warranted here (1) because of the legal relationship between Tillett and Kroma EU, which forced Tillett to champion Kroma EU's interests in the California action, (2) because of Kroma EU's substantial involvement in the prior suit, and (3) because of Kroma EU's numerous admissions in its pleading and in correspondence that it understood its rights were being represented and protected in the prior case. Allowing Kroma EU to pursue duplicative claims in spite of these facts would grant it "two bites at the apple." Indeed, by this action, Kroma EU is pursuing contract claims against Tillett for its share of the settlement payment in the prior case, while simultaneously pursuing the *same claimed losses* from Boldface and the Kardashians on trademark causes of action. The entire purpose of res judicata is to limit parties and their privies to one bite at the apple, thereby preventing the unjust windfall that Kroma EU would receive if it obtains the double recovery it is seeking. (*See infra* pp. 17-25.)

Accordingly, for the reasons discussed below, this Motion should be granted in its entirety.

## II.   STATEMENT OF UNDISPUTED FACTS

1.     Willey was deposed in this action as the managing agent and Fed.R.Civ.P. 30(b)(6) designee of Plaintiff Kroma EU. (Exs. B, C; Declaration of Michael J. Kump ("Kump Decl.") ¶¶ 3-4; *see also* Willey Depo. pp. 8:2-9:7.) [1]

2.     Willey read the Complaint in this action before it was filed, and to the best of her knowledge, everything alleged therein is true and accurate.[2] (Willey Depo. p. 81:7-19.)

### A.     The License Agreement for the KROMA Trademark.

3.     Defendant Tillett is a Florida-based cosmetics company founded by Aglaia Lee Tillett ("Ms. Tillett"). Tillett is the owner of U.S. Trademark Registration No. 4,079,066 for the use of the trademark KROMA in connection with cosmetics. (Dkt. No. 1, Compl. ¶¶ 4, 9; Declaration of Aglaia Lee Rodriguez, née Tillett ("Tillett Decl.") ¶¶ 1-2.)

---

[1]   Willey's testimony is attached to the Kump Decl. as Ex. A (hereinafter, "Willey Depo. p. __").

[2]   "The general rule [is] that a party is bound by the admissions in his pleadings. Indeed, facts judicially admitted are facts not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." *Cooper v. Meridian Yacht, Ltd.*, 575 F.3d 1151, 1177-78 (11th Cir. 2009)(internal quotations and citations omitted).

4.     In or about September 2010, Tillett entered into a license agreement granting Jay Willey, Ltd.—a U.K. company owned by Willey—the exclusive right to sell KROMA products in the European Union, including the U.K. (the "2010 Agreement"). (Compl. ¶ 10.) (Ex. D; Kump Decl. ¶ 5; *see also* Willey Depo. pp. 191:5-192:13; Tillett Decl. ¶ 3.)

5.     In or about October 2012, Tillett entered into a new license agreement granting Plaintiff Kroma EU—another U.K. company owned by Willey—the exclusive right to sell KROMA products in the European Union, including the U.K. (the "2012 Agreement"). (Compl. ¶ 12.) (Ex. E; Kump Decl. ¶ 6; *see also* Willey Depo. pp. 192:14-193:4; Tillett Decl. ¶ 4.)

6.     The 2010 Agreement between Tillett and Jay Willey, Ltd. and the 2012 Agreement between Tillett and Kroma EU—collectively referred to hereinafter as "License Agreement" or "Agreement"—contain "materially identical terms." (Compl. ¶ 12.)

**B.     Tillett Alone Has The Right And Responsibility To Protect and Enforce The KROMA Trademark.**

7.     In granting Jay Willey Ltd. and Kroma EU an exclusive license to the KROMA trademark in a limited Territory for a limited Term, Tillett's intention was to retain all rights at all times to the KROMA trademark, including retaining the sole right to protect, police, and enforce the KROMA mark in any infringement actions. The provisions of the License Agreement were drafted to carry out and memorialize that intent. (Tillett Decl. ¶¶ 6-7.)

8.     The License Agreement provides that Tillett "owns all rights on all items of intellectual property concerning all Goods shipped under this Contract," and that "the [KROMA] trademark always remains the exclusive and inalienable property of [Tillett]…." (Exs. D, E, §§ 4.1.2, 4.1.4; *see also* § 4.2.7 (licensee agrees to use trademark in accordance with contractual conditions); § 4.2.8 (Agreement is a license for right to use mark).)

9.     The License Agreement grants Jay Willey Ltd. and Kroma EU "the right to use the trademark of [Tillett] for advertising purposes and for the purpose of Goods sale and promotion in the Territory." (*Id*. § 4.2.1; *see also* § 4.2.3.) In the case of the 2012 License Agreement, the Term was to expire after three years on October 15, 2015 unless extended. (Ex. E, § 3.1.)

4

10.     Section 4.3 of the License Agreement, entitled "Renewal. Protection," addresses protection of the KROMA mark. Section 4.3.1 requires that Tillett "renew regularly" all trademark registration certificates and "protect them properly from any attempts of illegal use, to the best of his knowledge." (Exs. D, E, § 4.3.1.) Kroma EU's sole right and obligation regarding protection of the KROMA mark is "to inform [Tillett] of any illegal use of the trademark in the sales Territory, to the best of his knowledge." (*Id*. § 4.3.2; *see also* Tillett Decl. ¶ 7.)

11.     In section 4.3.3, "[Tillett] undertakes to hold [Kroma EU] harmless … and guarantees [Kroma EU] against any claims for the Goods sold by [Kroma EU] concerning the intellectual property rights (the right for the trademark, industrial sample, patent, invention, etc.)." (Exs. D, E, § 4.3.3.) Pursuant to this provision, "Tillett was contractually obligated to hold Kroma EU harmless against damages arising out of trademark infringement." (Compl. ¶ 33 n.4; *see also* Tillett Decl. ¶ 7; Dkt. 63 (Kroma EU opposition to motion to compel arbitration) at 3 of 12 & n.3 (alleging that section 4.3.3 "requires Tillett to hold harmless and guarantee Plaintiff against any claims concerning the Kroma trademark rights").)

### C.     Kroma EU's Participation In Settlement Negotiations With Boldface.

12.     In May 2012, the Kardashians entered into a licensing agreement with Boldface authorizing Boldface to create and market a line of color cosmetics endorsed by the Kardashians. (Compl. ¶ 19.) Boldface selected "Khroma" as the name of the product line. (*Id.* ¶ 27.)

13.     In June 2012, Tillett learned that Boldface intended to sell products under the "Khroma" name and sent a cease and desist letter to Boldface. (*Id.* ¶¶ 27-28.) On October 26, 2012, Tillett attorney Lauren Heatwole McCorvie ("McCorvie") sent another cease and desist letter to Boldface's attorney seeking "to negotiate a resolution." (*Id.* ¶ 32; Tillett Decl. ¶¶ 8-9.)

14.     In the following weeks in November 2012, McCorvie negotiated with Boldface's attorneys. Willey did not speak directly with Boldface's attorneys, but as confirmed in her deposition, McCorvie's negotiations "were protecting the interests of Kroma EU" and addressing its purported damages. (Willey Depo. pp. 89:3-18; *see also id.* pp. 86:8-89:2; 99:16-100:5, 104:1-24, 227:14-24, 229:21-244:16, 250:17-251:24) (Exs. F-P; Kump Decl. ¶¶ 7-17) (Tillett Decl. ¶ 9.)

15.     During McCorvie's settlement discussions with Boldface, "Tillett provided Willey every indication that her damages in the UK/EU would be sought during the negotiations," and "McCorvie (acting for Tillett) provided Willey with updates on settlement negotiation, marking them as 'attorney/client privileged' or 'confidential.'" (Compl. ¶ 33; *see also id.* ¶¶ 34-37.) Thus, "it was made abundantly clear to Willey (by McCorvie and Tillett), that the interests of Kroma EU were being protected"; and "in reliance on those representations, Willey provided information, financials, and later testimony, to support Tillett's case against Boldface/Kardashians." (*Id.* ¶ 38; *see also* Willey Depo. pp. 354:5-355:25) (Ex. U; Kump Decl. ¶ 22.)

16.     Among the financial information Willey provided to McCorvie for use in settlement discussions was a set of projected profits for Kroma EU for years 2013-2015. (Ex. J, p. 2; Kump Decl. ¶ 11; Exs. Q, R, and S; Kump Decl. ¶¶ 18-20.) These are the same financial projections that Kroma EU later provided to its damages expert Ronald Schmidt in this action for calculation of its alleged damages. (Willey Depo. pp. 271:25-273:5.)

**D.      Willey Participated Extensively In Tillett's Successful Motion To Enjoin Boldface From Using the KROMA Mark.**

17.     With the dispute unsettled, on November 30, 2012, Boldface filed a declaratory judgment action in the matter titled *Boldface Licensing + Branding, Inc. v. By Lee Tillett, Inc.*, C.D. Cal. Case No. CV 2:12-cv-10269-ABC-PJW (the "California Action"), seeking a declaration that its products did not infringe Tillett's KROMA trademark. (*See* Compl. ¶ 52.)

18.     After the California Action was filed, Willey was quoted extensively in an article on *The Mirror Online.co.uk* about her preparations to join Tillett in the fight against the Kardashians in the California Action. The article, titled "British mum accuses Kardashian family of stealing her product name for a range of new cosmetics," stated that Willey "is joining forces with [Tillett] to battle the reality stars through the US courts." (Ex. X; Kump Decl. ¶ 25; *see also* Exs. V, W (Kump Decl. ¶¶ 23-24); Willey Depo. pp. 364:18-366:1, 367:4-369:1.) Willey told a PR person: "[O]ur entire investment is tied into Lee [Tillett]. As such we will always protect her." (Ex. U; Kump Decl. ¶ 22; *see also* Willey Depo pp. 354:5-355:25.)

19.     On January 9, 2013, Tillett filed counterclaims in the California Action, including for vicarious liability for trademark infringement against the Kardashians. (Compl. ¶ 53; Ex. FF; Kump Decl. ¶ 33; Request for Judicial Notice ("RJN") ¶ 1.) Tillett was represented by McCorvie and the law firm of Fayer Gipson LLP. (*Id.*) Neither Kroma EU nor Willey appeared as a party in the Action. (Compl. ¶ 70.)

20.     "From the outset, [counsel] sought to build Tillett's case against Boldface/Kardashians, in part, by using information from Kroma EU regarding UK/EU damages." (Compl. ¶ 54; *see also id.* ¶¶ 55-58.) "[Tillett's counsel] had Kroma EU do significant legwork, marking communications with Willey as 'Joint Defense/Common Interest Privilege'—again bolstering Willey's perception that legal work on behalf of Tillett would protecting [sic] the rights of Kroma EU (as plainly required by Tillett pursuant to the agreement of the parties)." (*Id.* ¶ 55.) According to Kroma EU, "Tillett's principal repeatedly confirmed that all of the legal work done in relation to Boldface/Kardashians was for the benefit of both Tillett and Kroma EU." (*Id.* ¶ 57; *see also* Ex. X; Kump Decl. ¶ 25; Willey Depo. pp. 92:19-94:6.)

21.     In February 2013, Tillett filed a motion for preliminary injunction against Boldface. (Compl. ¶ 58.) The motion relied upon evidence supplied by Kroma EU, including the Declaration of Jay Willey with testimony regarding Kroma EU's purported sales (¶¶ 4-5), customers (¶¶ 6-9), alleged instances of confusion (¶¶ 9-13), and alleged damages due to the infringement (¶¶ 15-17). (Ex. GG; Kump Decl. ¶ 34; RJN ¶ 2; *see also* Ex. Z; Kump Decl. ¶ 27; Willey Depo. pp. 369:23-371:4; Tillett Decl. ¶ 12.)

22.     Willey's Declaration was cited on several key issues in the motion for preliminary injunction, in the supporting declaration of Ms. Tillett, and in a reply supporting the motion. (Ex. HH; Kump Decl. ¶ 35; RJN ¶ 3 (Ms. Tillett Declaration), ¶¶ 14, 19, 21 (U.K. sales), ¶¶ 59-61 (U.K. confusion); Ex. II; Kump Decl. ¶ 36; RJN ¶ 4 (Motion), pp. 10:17-24 of 30 (confusion), 10:26-27 (harm), 19:3-8 (strength of mark), 23:4-12 (sales), 27:19-28 (harm); Ex. KK; Kump Decl. ¶ 38; RJN ¶ 6 (Reply), ¶ 23, pp. 20:9-25, fn. 5 of 31 (sales); 27:27-28:3 (equities).) On reply, Ms. Tillett emphasized how Boldface's alleged infringement injured Kroma EU: "What happens in

this case has a direct effect on my European licensee's ability to secure distribution ….
[M]y European distribution will be lost." (Ex. JJ; Kump Decl. ¶ 37; RJN ¶ 5, p. 8, ¶ 23.)

23.    On March 11, 2013, the court granted Tillett's motion and enjoined Boldface's
distribution of Khroma products. (Compl. ¶ 58; Ex. LL; Kump Decl. ¶ 39; RJN ¶ 7; Willey Depo.
p. 371:5-373:15.) Boldface then changed the name of its product line from Khroma to "Kardashian
Beauty." (Willey Depo pp. 386:12-387:24; Exs. CC-DD; Kump Decl. ¶¶ 30-31.)

**E.    Kroma EU Cites the License Agreement in Demanding Protection.**

24.    Willey and her lawyers never contacted Boldface or the Kardashians to discuss
settlement in connection with the California Action. (Willey Depo. pp. 389:13-391:11.) Instead,
Willey understood "that all damages incurred in the UK/EU were sought in [Tillett's] negotiation
and litigation pursued in California against Boldface and the Kardashians." (Compl. ¶ 104; *see
also* ¶¶ 105-106.)

25.    To ensure that her interests were represented in the California Action, Willey
engaged U.K. counsel for Kroma EU, Brandon Titterington ("Titterington"). (Compl. ¶¶ 62-65.)
Titterington wrote on March 20, 2013 to Tillett's counsel, McCorvie and Gipson, that Kroma EU
"believe[d] that any settlement reached with Boldface/Kardashians would also include provision
for [its] losses." (Ex. EE, p. 5; Kump Decl. ¶ 31; *see also* Willey Depo. pp. 375:1-386:10.)
Titterington added:

> *At clause 4.3.1 the contract obligates your client to properly protect the brand from
> any attempts of illegal use within the Territory* and imposes an obligation on my
> client to inform of any such illegal use within the Territory. My client has complied
> with her obligations. *Whilst your client has litigated the Khroma infringement
> action in the USA, no such action has been taken in Europe, which constitutes a
> clear breach of contract.* My client has suffered a substantial financial loss as a
> result. If it is your client's intention to incorporate [Kroma EU's] losses into any
> settlement reached with Boldface/Kardashians, you will no doubt confirm. If not,
> then my client will have little option but to bring proceedings against *your client* for
> all losses suffered.

(Ex. EE, p. 5 (emphasis added).)

26.    McCorvie responded to Titterington the next day (March 21, 2013) to reassure that
Kroma EU's interests were being protected, writing that "[Ms. Tillett] is giving all that she has to

protect her company and her trademark for the good of the company, including the good of her distributor (Jay)." (Ex EE, p. 3.) McCorvie added that section 4.3 of the License Agreement "is meant to project Jay [Willey] from the third party claims for intellectual property infringement. That is exactly what [Ms. Tillett] is doing." (*Id*., p. 4.) McCorvie concluded: "If the case does settle and Jay [Willey] thinks that she should be compensated or feels she was unjustly treated, then she has remedies under her Contract, to wit: to initiate mandatory arbitration in Florida." (*Id*.)

27.     On April 9, 2013, Titterington again wrote to McCorvie: "If it is the case that negotiations are ongoing with Boldface, with a view to settlement of the USA action, then my client requires confirmation that her interests will be protected and form part of any such settlement." (Ex. EE, p. 2.)

28.     In deposition, Willey confirmed that Titterington was acting on her and Kroma EU's behalf, and that his assertions to McCorvie were consistent with her position and her understanding of the License Agreement. (Willey Depo. pp. 377:5-383:25, 385:12-20.)

**F.     The Settlement and Dismissal of the California Action.**

29.     On April 18, 2014, the parties in the California Action filed a Notice of Settlement. (Compl. ¶ 68; Ex. MM; Kump Decl. ¶ 40; RJN ¶ 8.)

30.     A "Settlement Agreement and Mutual General Release" dated as of June 2, 2014 was entered into by Tillett, Boldface, and the Kardashians. The settlement (i) required Boldface to make a "Settlement Payment" to Tillett; (ii) included mutual general releases of any "Claims and Obligations, of whatever kind or nature, in law, equity or otherwise, whether known or unknown," including any Claims and Obligations "which were, might or could have been asserted in connection with the [California] Action, the KROMA mark, the KHROMA mark or the KARDASHIAN BEAUTY mark"; and (iii) required dismissal with prejudice of the California Action upon the satisfaction of certain requirements. (Kump Decl. ¶ 42; Tillett Decl. ¶¶ 13-14.)

31.     On September 8, 2014, the Court dismissed the California Action with prejudice pursuant to the parties' stipulation. (Ex. NN; Kump Decl. ¶ 41; RJN ¶ 9.)

G.   **Kroma EU Files This Action Without Tillett's Approval**.

32.    After settlement of the California Action, Tillett did not share any of the settlement proceeds with Kroma EU. (Compl. ¶¶ 68, 109.) Kroma EU then filed this action.

33.    Kroma EU asserts a claim for breach of contract against Tillett in Count VI. (Compl. ¶¶ 103-111; *see also* Dkt. 52, Order at 26-29.) Kroma EU alleges that Tillett breached the License Agreement by "refus[ing] to share in its settlement of the California litigation." (Dkt. 52, Order at 29, citing Compl. ¶¶ 33-34, 38, 62-67.) Kroma EU seeks damages "[a]s a result of Tillett's refusal to share in these settlement proceeds." (*Id*., citing Compl. ¶¶ 70, 109-110.)

34.    In addition to seeking its alleged losses from Tillett, Kroma EU also seeks to recover those *same* damages from the Kardashians in Counts III, IV and V for vicarious liability for trademark infringement. (Compl. ¶¶ 86-102.) These are the same trademark claims asserted by Tillett against the Kardashians in the California Action. (*Compare* Counterclaims ¶¶ 74-88 (Ex. FF) *with* Compl. ¶¶ 103-111.)

35.    Tillett, the owner of the KROMA trademark, did not authorize Kroma EU to file this action for infringement of the mark. (Tillett Decl. ¶ 17.)

III.   **LEGAL STANDARDS FOR SUMMARY JUDGMENT**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is "not a disfavored procedural shortcut," but rather is the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

IV.   **KROMA EU'S CLAIMS AGAINST THE KARDASHIANS FAIL AS A MATTER OF LAW FOR LACK OF STANDING.**

Summary judgment should be granted in favor of the Kardashians because Kroma EU has *no standing* to sue for trademark infringement. As discussed below, the law is clear that a trademark licensee's right to sue for infringement is subject to the limitations of its license. The Agreement here reserves to Tillett the right and authority to police and protect the KROMA trademark. As a result, this action by Kroma EU is unauthorized and therefore impermissible.

A.   **A Licensee's Ability To Sue for Trademark Infringement is Determined by its License Agreement.**

Section 43(a) of the Lanham Act prohibits the use in commerce of "any word, term, name, symbol, or device … or any false designation of origin" which is likely to cause confusion or mistake as to the origin, sponsorship, or approval of goods or services. 15 U.S.C. § 1125(a)(1). Because Section 43(a) authorizes "any person who believes that he or she is or is likely to be damaged" to file suit, *id.*, certain non-owners of a trademark may sue for violations of Section 43(a). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, __ U.S. __, 134 S. Ct. 1377, 1395, 188 L. Ed. 2d 392 (2014).

For trademark licensees, however, standing under Section 43(a) is not unlimited. The law is well-established that the terms of the license agreement control whether licensees have standing to file their own action for trademark infringement under Section 43(a). *See*, *e.g.*, *Finance Inv. Co. (Bermuda) Ltd. v. Geberit AG*, 165 F.3d 526, 532 (7th Cir. 1998); *Drew Estate Holding Co. v. Fantasia Distribution, Inc.*, 875 F. Supp. 2d 1360, 1366 (S.D. Fla. 2012) (holding that a "licensee's standing to bring a trademark infringement claim largely depends on the rights granted to the licensee in the licensing agreement"); *Aceto Corp.*, 953 F. Supp. 2d at 1279 (same).

A licensee has no standing to sue for infringement under Section 43(a) where, as here, the license agreement prohibits or restricts the licensee's right to do so. In *Finance Investment*, for example, plaintiff ("FIC") was granted a license to the trademark CLOSOMAT. 165 F.3d at 529. FIC and two of its sub-distributors sued a competitor for trademark infringement under

Section 43(a). *Id.* The Court of Appeal affirmed FIC and its two distributors lacked standing to assert a Section 43(a) claim, holding:

> Even assuming [FIC and its distributors] met the statutory requirement [under section 43(a)] of being a "person who believes that he or she is likely to be damaged" by a likelihood of confusion, *the express terms of the license prohibited any of them from bringing suit in their own capacity.*

*Id.* at 532 (emphasis added). The court explained that under the license agreement, "if FIC had knowledge of an infringement, it was under a duty to notify [the licensor]." *Id.* "At that point … [the licensor] was obligated to bring suit." *Id.* The license was clear, however, that "*only* if [the licensor] failed to sue could FIC institute its own action as a plaintiff." *Id.* (emphasis in original). FIC lacked standing because "FIC failed to give notice to [its licensor] before suing," and the licensor "never gave consent for the plaintiffs to bring suit in their own right." *Id.* The Seventh Circuit concluded: "Because the license is the sole source giving the plaintiffs *any* interest in the CLOSOMAT mark, that same license's refusal to give them the right to sue under these circumstances strips them of the right to raise a § 43(a) claim." *Id.* (emphasis in original).

Similarly, in *O.O.C. Apparel, Inc. v. Ross Stores, Inc.*, 2007 WL 869551 (D.N.J. Mar. 20, 2007), the district court held that a licensee of the SEAN JOHN trademark lacked standing to assert a Section 43(a) claim under the terms of its license agreement. *Id.* *3. The license stated that the licensee "promptly shall notify Licensor" of any infringement; that the licensor and its affiliates would then "take such action as they in their sole discretion deem advisable for the protection of their respective rights in and to the Licensed Mark"; and that the licensee could not file its own action without the licensor's approval. *Id.* Finding that plaintiff never obtained the trademark holder's approval to file suit, the district court granted summary judgment for lack of standing. *Id.* *4; *see also Visa U.S.A. Inc. v. First Data Corp.*, 2005 WL 6271242 at *5 (N.D. Cal. Aug. 16, 2005) (granting summary judgment and holding that licensee "lacks standing to sue because the license agreement specifically provides that Visa International retains the sole right to engage in unfair competition proceedings involving the VISA Marks"); *Aceto Corp.*, 953 F. Supp. 2d at 1285 (granting motion to dismiss because licensee-distributor "has not established standing

under Section 43(a) of the Lanham Act" in suit against competitor); *contrast Drew Estate*, 875 F.

Supp. 2d at 1366 (holding that trademark licensee had standing where license agreement *expressly*

provided licensee "may prosecute any action or proceeding which Licensee deems necessary or

desirable to protect the Licensed Mark").

> **B.     The Plain Language of the License Agreement Confers No Standing Upon
> Kroma EU to File Infringement Actions.**

As set forth in the cases above, Kroma EU's standing to file its own trademark action

depends upon the terms of its License Agreement with Tillett. When interpreting the Agreement,

"it is well settled that the actual language used in the contract is the best evidence of the intent of

the parties and, thus, the plain meaning of that language controls." *Feldkamp v. Long Bay*

*Partners, LLC*, 773 F. Supp. 2d 1273, 1280 (M.D. Fla. 2011) (quoting *Rose v. M/V Gulf Stream*

*Falcon*, 186 F.3d 1345, 1350 (11th Cir. 1999).) "Under Florida law the Court does not read clauses

in a contract in isolation, but looks to the contract as a whole." *Id.* (citing *Jones v. Warmack*, 967

So. 2d 400, 402 (Fla. 1st DCA 2007).

The language in the License Agreement is clear that Tillett *alone* owns, controls, protects,

and polices the KROMA trademark, while protecting the interests of its licensee, Kroma EU, by

holding it harmless from any damages arising from infringement of the KROMA mark. (UF 4-

11.)[3] Section 4.1.4 expressly provides that the KROMA mark "always remains the exclusive and

inalienable property" of Tillett; Kroma EU's rights are limited to using the mark "for advertising

purposes and Goods sale and promotion" in the Territory during the Term. (Exs. D, E, §§ 4.1.4,

4.2.) Consistent with the limits on Kroma EU's rights in the trademark, the License Agreement in

section 4.3 contains a "Renewal. Protection" provision that reserves to Tillett the right and

obligation to protect the KROMA mark and Tillett's licensees. (*Id.*, § 4.3.) Specifically, section

4.3.1 requires that Tillett "protect [the KROMA mark] properly from any attempts of illegal use,"

while section 4.3.2 limits Kroma EU's sole right and obligation regarding protection of the

KROMA mark "to inform[ing] [Tillett] of any illegal use of the trademark in the sales Territory."

---

[3]   This refers to "undisputed facts" numbered 4-11 on pages 4-5 *supra*.

(*Id.*) From there, it is Tillett—not Kroma EU—who "undertakes" to protect the KROMA mark "from any attempts of illegal use." (*Id.* § 4.3.1.) If Kroma EU has been harmed by infringement of the KROMA mark, then as Kroma EU alleges in its Complaint, *Tillett* is contractually obligated under section 4.3.3 "to hold Kroma EU harmless from those losses as a result of any infringement." (*See* Compl. ¶ 33 n.4.)

Section 4.3 of the License Agreement plays the same role as the license provisions at issue in *Finance Investment, O.O.C. Apparel*, and *Visa*—*i.e.*, it determines who has the right and obligation to protect the KROMA mark. Here, as in each of those cases, the terms of the License Agreement place the enforcement and protection of the trademark exclusively in the hands of its owner, Tillett. (Exs. D, E, §§ 4.1-4.3; Tillett Decl. ¶¶ 6-7.) But unlike the provisions in *Finance Investment* and *O.O.C. Apparel*, section 4.3 does *not* authorize Kroma EU to file its own action under any circumstances. The plain meaning of the actual language used in section 4.3 controls: Tillett must "protect [the KROMA mark] properly from any attempts of illegal use," while Kroma EU is only allowed to "inform [Tillett] of any illegal use of the trademark in the sales Territory." *Feldkamp*, 773 F. Supp. 2d at 1280.

Thus, Kroma EU lacks standing and its trademark claims fail. *Finance Inv. Co.*, 165 F.3d at 532; *O.O.C. Apparel, Inc.*, 2007 WL 869551 at *3-4; *Visa U.S.A. Inc.*, 2005 WL 6271242 at *5.

**C.**    **The Conduct of the Parties Corroborates That Kroma EU Does Not Have Standing to Files its Own Infringement Action.**

Both the plain language of the License Agreement and Ms. Tillett's Declaration establish that the Agreement does not permit Kroma EU to file its own infringement action. So too do the actions of Tillett and Kroma EU undertaken prior to the filing of this action.

In interpreting an agreement, the "practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." *Hirsch v. Jupiter Golf Club LLC*, 2017 WL 448952, __ F. Supp. 3d. __, 2017 WL 448952 *6 (S.D. Fla. Feb. 1, 2017) (quoting *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967, 57 L.Ed. 1410 (1913).) Accordingly, the "Court

may review the original contracting parties' post-contract course of performance of the agreement to interpret their intent." *Id.*; *see also Brevard Co. Fair Ass'n, Inc. v. Cocoa Expo., Inc.*, 832 So. 2d 147, 151-52 (Fla. 5th DCA 2002) (same).

In several respects, the conduct of Tillett and Kroma EU and their principals prior to the filing of this action evidences the parties' understanding that the License Agreement does not authorize infringement suits by the licensee, and instead obligates Tillett to protect Kroma EU's interests by pursuing infringers and holding Kroma EU harmless from any damages. Starting with the settlement negotiations in November 2012, Willey was integrally involved and yet never communicated directly with Boldface or the Kardashians to demand a settlement of Kroma EU's alleged losses. Kroma EU acted solely through Tillett and its counsel, providing McCorvie with information including profit projections for McCorvie to use to fold Kroma EU's claimed losses into an overall settlement. (UF 13-16.)

Similarly, Kroma EU was extensively involved in the California Action, including submitting Willey's Declaration (Ex. GG) that was critical to Tillett's injunction motion. (UF 19-23.) Kroma EU never appeared, but allowed and expected Tillett and its counsel to represent Kroma EU's interests. (*See, e.g.*, Compl. ¶ 57 (alleging "that all of the legal work done in relation to BOLDFACE/KARDASHIANS was for the benefit of both TILLETT and KROMA EU").) This likewise evidences Willey's understanding that Kroma EU could not file its own claims.

Finally, discussions in March and April 2013 between counsel for Tillett and Kroma EU further evidence the parties' understanding that Kroma EU could not enforce the trademark on its own and had to look to Tillett for indemnification of any losses. (UF 24-28.) Kroma EU's counsel (Titterington) wrote to McCorvie that section 4.3 obligated Tillett to pursue infringement claims against the Kardashians and incorporate Kroma EU's claimed damages into any settlement. (Ex. EE, p. 5.) Titterington threatened McCorvie that he would "bring proceedings against *your client* for all losses suffered" by Kroma EU if it received no portion of Boldface's settlement payment. (*Id.*) McCorvie responded that "[i]f the case does settle and Jay thinks that she should be compensated or feels she was unjustly treated, then she has remedies under her Contract, to wit: to

initiate mandatory arbitration [against Tillett] in Florida ….” (*Id.* p. 4.) Tellingly, neither lawyer suggested that in addition to pursuing claims against Tillett pursuant to the License Agreement, Kroma EU might also assert infringement claims against Boldface and the Kardashians.

The words and actions of the parties, and their principals and lawyers, confirm the parties' agreement in the License Agreement that Kroma EU does not have the right to file this action. Moreover, the fact that Kroma EU never sought to negotiate directly with Boldface or the Kardashians, that it never sought to intervene in the California Action, and that the discussions among the parties' counsel referenced the potential for Kroma EU to sue *only* Tillett for its losses, all support what the plain language of the License Agreement and Tillett Declaration evidence: the Agreement was never intended to and does not authorize Kroma EU to file suit against infringers.

### D.   <u>Summary Judgment Should be Granted for Lack of Standing</u>.

Here as in *Finance Investment*, “the license is the sole source giving [Kroma EU] *any* interest in the [ ] mark,” and therefore “that same license's refusal to give [Kroma EU] the right to sue under these circumstances strips [it] of the right to raise a § 43(a) claim.” *Finance Investment*, 165 F.3d at 523 (emphasis in original). This did not leave Kroma EU without recourse for the alleged infringement of the KROMA mark. The Agreement protects Kroma EU by *requiring* Tillett to police and protect the mark (which it did), and by requiring Tillett to hold Kroma EU harmless for any damages it suffers as the result of infringement. If Kroma EU is unhappy with the result of the California Action or with the fact that it did not share in the settlement payment to Tillett, its remedy is to initiate an arbitration against Tillett in Florida, just as Kroma EU's and Tillett's lawyers recognized, and as Kroma EU has done. But Kroma EU does not have standing to assert claims for trademark infringement under either Section 43(a) or Florida common law, and therefore, summary judgment should be granted. *See Finance Investment*, 165 F.3d at 523; *O.O.C. Apparel,* 2007 WL 869551 *4; *Visa U.S.A.*, 2005 WL 6271242 *5; *see also Gift of Learning Foundation, Inc. v. TGC, Inc.,* 329 F.3d 792, 802 (11th Cir. 2003) (discussing that liability for infringement under Florida common law tracks the analysis under the Lanham Act).[4]

---

[4]      In its prior order in this case, *Kroma Makeup EU, Ltd. v. Boldface Licensing & Branding,*

## V.   KROMA EU'S CLAIMS AGAINST THE KARDASHIANS ARE BARRED BY THE DOCTRINE OF RES JUDICATA

Separate and apart from issues of standing, summary judgment should be granted under the doctrine of res judicata. Kroma EU is attempting to re-litigate the same claims that were litigated, settled, and dismissed with prejudice in the California Action. Although Kroma EU was not a named party in that Action, Supreme Court and Eleventh Circuit precedent is clear that "a nonparty is bound by a judgment if he was in privity with a party to that judgment." *McCulley*, 605 Fed. Appx. at 877. As discussed below, Kroma EU's close relationship with Tillett, its insistence and understanding that Tillett was representing its interests, and its extensive participation in the California Action, all compel application of the doctrine of "nonparty preclusion."

### A.   Legal Standard for Res Judicata.

In determining the res judicata effect of the California Action, federal common law applies. *See Baloco v. Drummond, Inc.*, 767 F.3d 1229, 1246 (11th Cir. 2014) ("Federal courts must apply federal common law to determine the preclusive effect of a prior federal court judgment."). "A subsequent suit is barred under the doctrine of claim preclusion when the following four elements are present: (1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the same cause of action is involved in both cases; and (4) the parties, *or those in privity with them*, are identical in both suits." *Id.* (emphasis added).

### B.   The First Three Elements of Res Judicata Are Easily Met.

The first three elements of res judicata are indisputably satisfied here: *First*, there is no question that the judgment of dismissal with prejudice in the California Action based on the

---

*Inc.*, 2015 WL 1708757 (M.D. Fl. Apr. 15, 2015), this Court addressed the issue of standing (although the defendants had not moved to dismiss on that basis). *See id.* *4-6. In its ruling, "the Court conclude[d] that Kroma EU has *alleged sufficient facts* to carry its burden of establishing standing *at the pleadings stage*." *Id.* *6 (emphasis added). In so finding, the Court emphasized that "[a]t the pleadings stage, general factual allegations which show that the plaintiff has standing are sufficient to meet this burden." *Id.* *4. That determination of course does not preclude the Court from granting summary judgment here, where the Court is no longer bound by the Complaint and may rely upon evidence outside the pleadings which was not before it last time, including the specific language of the License Agreement, the Tillett Declaration, and the communications between Tillett and Kroma EU.

settlement agreement among Tillett, Boldface, and the Kardashians is a final judgment on the merits. (UF 29-31.) A "'stipulation of dismissal with prejudice … normally constitutes a final judgment on the merits which bars a later suit on the same cause of action.'" *Norfolk Southern Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1288 (11th Cir. 2004) (quoting *Astron Indus. Assoc., Inc. v. Chrysler Motors Corp.*, 405 F.2d 958, 960 (5th Cir. 1968).) This includes "[w]here the parties consent to such a dismissal based on a settlement agreement." *Id.*; *see also Rameses, Inc. v. County of Orange*, 481 F. Supp. 2d 1305, 1312 (M.D. Fla. 2007) ("Stipulated dismissals with prejudice based on settlement may constitute res judicata of subsequent, repetitive claims").

*Second*, the U.S. District Court in Los Angeles is a court of competent jurisdiction.

*Third*, this action asserts the "same cause of action" against the Kardashians as the California Action. (UF 33-34.) The Eleventh Circuit follows "the so-called 'transactional' approach to determine whether the case before the court asserts 'the same cause of action' as the previously litigated case." *Baloco*, 767 F.3d at 1247. Under that approach, "'[i]f a case arises out of the same nucleus of operative facts, or is based upon the same factual predicate, as a former action … the two cases are really the same 'claim' or 'cause of action' for purposes of res judicata.'" *Id.* (quoting *Griswold v. County of Hillsborough*, 598 F.3d 1289, 1293 (11th Cir. 2010).) Thus, "'[r]es judicata applies not only to the precise legal theory presented in the prior case, but to all legal theories and claims arising out of the same nucleus of operative fact [which could have been raised in the prior case].'" *Id.* (quoting *N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1561 (11th Cir. 1990). The Complaint here asserts the same claims for trademark infringement against the Kardashians asserted in the California Action, and thus clearly arises out of the same "nucleus of operative fact." (*Compare* Counterclaims ¶¶ 74-88 (Ex. FF) *with* Compl. ¶¶ 103-111.)

## C.   Kroma EU Was in Privity with Tillett.

The *only* question in applying the doctrine of res judicata is whether Kroma EU was in privity with Tillett. The uncontroverted facts and circumstances compel a finding that it was.

In 2008, the Supreme Court in *Taylor v. Sturgell* reaffirmed that res judicata can apply to persons who were not parties to the prior suit. 553 U.S. 880, 893, 128 S. Ct. 2161, 171 L. Ed. 2d

155 (2008). The Court in *Taylor* held that the "preclusive effects of a judgment in a federal-question case decided by a federal court should [ ] be determined according to the established grounds for nonparty preclusion described in this opinion." *Id.* at 904. Specifically, *Taylor* set forth in the disjunctive six *separate and distinct* circumstances in which res judicata will apply to persons not parties to the prior judgment: "(1) the nonparty agreed to be bound by the litigation of others; (2) a substantive legal relationship existed between the person to be bound and a party to the judgment; (3) the nonparty was adequately represented by someone who was a party to the earlier suit; (4) the nonparty assumed control over the litigation in which a judgment was issued; (5) a party attempts to relitigate issues through a proxy; or (6) a statutory scheme forecloses successive litigation by nonlitigants." *Baloco*, 767 F.3d at 1250 (citing *Taylor*, 553 U.S. at 893-895); *see also Griswold*, 598 F.3d at 1292-1293.

The determination of whether Kroma EU was in privity with Tillett for purposes of nonparty claim preclusion is "one of fact for the [district] court." *Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir. 1988) (internal quotations and citations omitted). Courts frequently grant summary judgment on this defense. *See*, *e.g.*, *Baloco*, 767 F.3d at 1251 (affirming summary judgment on res judicata grounds where certain plaintiffs had a "substantive legal relationship" with the parties to a prior judgment); *Griswold*, 598 F.3d at 1293 (affirming summary judgment where district court "did not err by holding that Griswold was in privity"). Here too, summary judgment is warranted on the basis of nonparty claim preclusion.

### 1.    Kroma EU and Tillett Were in Privity Because of their Substantive Legal Relationship.

Kroma EU's substantive legal relationship with Tillett at the time of the California Action warrants a finding that the parties were in privity. *Taylor* identifies "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor" as examples of "substantive legal relationships" on which privity can be based. *Taylor*, 553 U.S. at 894. Courts have thus found that an assignee of a trademark is bound under claim and issue preclusion rules by prior judgments concerning that trademark. *See*, *e.g.*, *Axiom Worldwide, Inc. v. Excite Med. Corp.*, 591 Fed. Appx.

767, 773 (11th Cir. 2014) (holding that "assignee of a trademark 'steps into the shoes' of the assignor" and that the plaintiffs "were properly precluded from re-litigating the trademark ownership issue in this case"); *Peter Coppola Beauty, LLC v. Casaro Labs, Ltd.*, 108 F. Supp. 3d 1323 (S.D. Fla. 2015) (finding because of trademark assignment that "it is likely that on a final determination on the merits … it will be decided that a substantive legal relationship exists … such that Plaintiff is precluded from asserting these claims").

Although Kroma EU was not formally the assignee of the KROMA trademark, it had a substantive legal relationship with Tillett as the exclusive licensee of the mark, which supports a finding of privity. *See Tycom Corp. v. Redactron Corp.*, 380 F. Supp. 1183, 1189 (D. Del. 1974) (finding a likelihood of privity in context of licensor and licensee of patent). The particular nature of the licensor-licensee relationship here warrants a finding of privity. The Agreement specified that Kroma EU's role in policing the mark was simply to identify infringement, at which time Tillett would file suit and indemnify Kroma EU from any losses caused by the infringement. (UF 7-11.) Kroma EU's own counsel, Titterington, asserted that it was Tillett's obligation to take action against Boldface and the Kardashians, and to recover against them for Kroma EU's purported damages. (Ex. EE, p. 3 ("If your client is not proposing that Jay [Willey] have ownership of the mark in the EU, then it must be the responsibility of your client under the terms of the contract to take action against infringers in relation to the unregistered mark").)

Under this arrangement, where Tillett had an *affirmative obligation* to enforce the KROMA trademark on Kroma EU's behalf *and then account to Kroma EU for its losses*, Kroma EU is logically and appropriately bound by the results of any such lawsuit that Tillett files on its behalf. *Accord Tycom*, 380 F. Supp. at 1189 (noting that "Holmes has expressly given Tycom the exclusive right to litigate all actions for infringement of the Holmes patent," and holding that "when a licensor-patentee is deemed to have surrendered the right to sue to his licensee, res judicata attends the success or failure of suit so brought by the licensee"). If Kroma EU were not bound to the results of Tillett's lawsuit, then in *every* case it would have "two bites" at any alleged infringer. Kroma EU's "first bite" is the action that Tillett *must* file on Kroma EU's behalf

pursuant to sections 4.3.1 and 4.3.3 of the License Agreement. The "second bite" is the action that Kroma EU itself could file subsequently if the result of Tillett's action was unfavorable. Such an undertaking, however, would eviscerate the very purpose of res judicata, which is to prevent parties from engaging in seriatim litigation of the same claims. *See Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 500-501 (5th Cir. 2004) (holding that res judicata reflects the principle that a "party gets only 'one bite at the apple'").

### 2. Kroma EU Was in Privity with Tillett Because it was "Adequately Represented" in the California Action.

Privity also existed because Tillett "adequately represented" Kroma EU in the California Action. (UF 17-23.) *Baloco*, 767 F.3d at 1250. Kroma EU *repeatedly* alleges throughout its Complaint that its interests were being represented in the California Action. (*See, e.g.*, Compl. ¶¶ 34 n.5 ("It is difficult to imagine a clearer indication that MCCORVIE/TILLETT are protecting the interests of KROMA EU in relation to the dispute with BOLDFACE/KARDASHIANS."); *id.* ¶ 38 ("… it was made abundantly clear to WILLEY … that the interests of KROMA EU were being protected"); *id.* ¶ 55 (citing "WILLEY's perception that legal work on behalf of TILLETT would [be] protecting the rights of KROMA UK (as is plainly required by TILLETT pursuant to the agreement of the parties)"); *id.* ¶ 57 ("TILLETT's principal repeatedly confirmed that all of the legal work done in relation to BOLDFACE/KARDASHIANS was for the benefit of both TILLETT and KROMA EU").)

To find privity, the Court need look no further than the myriad of these binding admissions in the Complaint, which establish that Kroma EU's interests were being represented in the California Action. *Cooper*, 575 F.3d at 1177-78. That said, other facts and circumstances which courts consider on the issue of adequate representation also support a finding of privity:

### (a) Close Alignment of Interests.

In assessing whether there was adequate representation in a prior suit, courts consider whether the parties "interests were closely aligned." *Peter Coppola*, 108 F. Supp. 3d at 1333. Here, Tillett's and Kroma EU's interests obviously were aligned in the California Action. The Action

was intended to and did inure to Kroma EU's benefit, just as alleged in the Complaint. Because of Tillett's pursuit of the action, only a few "Khroma" products were offered for sale for just a few months  in the U.K. (Ex. T, p. 2; Kump Decl. ¶ 21); the alleged infringement was promptly enjoined (Ex. LL), causing Boldface to change the name of its product (Ex. CC); and the case generated worldwide publicity for Tillett, Kroma EU, and Willey (Exs. X, BB, DD.) The California Action thus achieved Kroma EU's primary objective of stopping the sale of allegedly infringing products.

Tillett's and Kroma EU's interests were also aligned with regard to the pursuit of monetary relief from Boldface and the Kardashians, particularly in light of the requirement of section 4.3.3 of the License Agreement that Tillett indemnify Kroma EU for any of its losses. In *Peter Coppola*, the district court noted the existence of a "written agreement to share the damages recovered in the Prior Litigation" and held that this "also reflects that their interests were closely aligned." 108 F. Supp. 3d at 1333. Here too, the intent as reflected in the License Agreement was always for Tillett to hold Kroma EU harmless for any damages it suffered as the result of trademark infringement. (Compl. ¶ 33 n.4.) Accordingly, Tillett sought Kroma EU's claimed losses throughout the California Action. (*See*, *e.g.*, Compl. ¶¶ 33, 38, 55, 57, 104, 107.)

### (b)      Participation in the Prior Litigation.

The extent of the party's participation in the prior litigation is also an important factor considered by courts in assessing privity. *See Peter Coppola*, 180 F. Supp. 3d at 1334 (relying on fact that party to be estopped "participated regularly in litigation strategy"); *see also Jaffree*, 837 F.2d at 1468 (citing "participation in the first litigation" as a factor). That factor overwhelmingly supports a finding of "adequate representation" here. (UF 13-23.)

Kroma EU participated extensively in the California Action. (UF 19-23.) Prior to the filing of the Action, Kroma EU provided Tillett with financial projections to support Tillett's settlement demands to Boldface. (Exs. I, J, p. 2, Q-S (projections).) Kroma EU and Tillett strategized regarding settlement posture (Ex. N), and discussed the costs and risks of litigation (Ex. O) as well as a strategy for using the press to publicize the dispute. (Ex. P, pp. 1-2 (discussing a "joint media

game plan"); Ex. W (media).) Then when Tillett filed the California Action, Kroma EU and Willey provided information to "build TILLETT's case against BOLDFACE/KARDASHIANS" (Compl. ¶ 54), as well as testimony and evidence from Willey that was relied upon in obtaining the preliminary injunction. (UF 21-22.)

### (c)   Admission of a Common Benefit.

In *Peter Coppola*, the district court found that privity was evidenced by statements about the "common goal" of the prior litigation. 108 F. Supp. 3d at 1333. The court there noted the parties' use of the inclusive terms "we" and "us" when discussing the prior litigation, as if the parties were "one and the same"—for example, statements that "*we* have a solid case" that the defendant has "until Monday to give *us* an offer *we* can accept." *Id.* at 1334 (emphasis in original).

Here, the statements of *both* Tillett and Kroma EU contemporaneous with the California Action reflect their understanding that the litigation was being pursued on Kroma EU's behalf. As the Complaint alleges, "TILLETT's principal repeatedly confirmed that all of the legal work done in relation to BOLDFACE/KARDASHIANS was for the benefit of both TILLETT and KROMA EU, for example, writing: 'Just to confirm Jay, all this work *we're* doing right now … is to see if *we* get a [preliminary injunction] ….' (Compl. ¶ 57 (emphasis in original); Ex. Y; *see also* Ex. EE, p. 3 (McCorvie email stating that Tillett "is giving all that she has to protect her company and her trademark for the good of the company, *including the good of her distributor (Jay)*").)

Even more persuasive, Willey herself made numerous statements of the sort described in *Peter Coppola*, which evidenced her understanding that Kroma EU was being represented in the California Action. Willey at all times acted as though settlement negotiations were on her behalf, stating in one email to McCorvie: "How did the meeting go? Hope *we* have some good news!" (Ex. L, p. 3.) In another email questioning Boldface's settlement position, Willey asked: "If they think they have done nothing wrong, then why haven't they just told *us* to 'get lost' for want of a better word?" (Ex. N, p. 2.) Further, Willey made numerous statements reflecting that Kroma EU was, for all intents and purposes, a litigant in the California Action. After the case was filed in November 2012, Willey expressed frustration to Tillett about the Kardashians: "I hate them Lee its

more and more frustrating. That said *I'm* about to show the public that all that glistens isn't always Gold :-) They certainly won't shine when *I've* finished with them." (Ex. V, p. 1 (emphasis added).)

Even more to the point, Willey sent Tillett and McCorvie a draft news article that she participated in to publicize the lawsuit, and with Willey's approval, the article contains repeated admissions that Kroma EU was in effect a party to the California Action. (Ex. W, pp. 2 *et seq.*) The article starts: "A BRITISH mum-of-two [*i.e.*, Willey] has gone to war with reality TV stars The Kardashians …." (*id.* p. 2), stating on the following page: "Jay [Willey], who runs the EU arm of KROMA and the owner and creator of KROMA Lee Tillett are now about to battle the superstars through the courts." (*Id.* p. 3.) Willey is also quoted in the article with telling statements such as "*[w]e've* been in negotiation with their lawyers" and "*we* are fighting back." (*Id.* p. 3 (emphasis added).) That article was eventually published with Willey's blessing. (*See* Ex. X.) Clearly, Willey saw the counterclaims in the California Action as Kroma EU's claims.

### (d)    Statements of Common Interest Privilege.

In yet another example, *Peter Coppola* commented that "[p]erhaps most telling is Plaintiff's assertion of the 'common interest' and 'joint defense' privileges to communications during the course of the Prior Litigation …." 108 F. Supp. 3d at 1333-1334. The district court stated: "By asserting this privilege, Plaintiff effectively concedes that its legal interests throughout the case were aligned with [the plaintiff in the prior litigation]." *Id.* at 1334.

Here too, Tillett and Kroma EU asserted a common interest privilege during the California Action, thus recognizing the close alignment of their interests. (*See* Compl. ¶ 33 (referencing Ex. F (McCorvie's instruction to Kroma EU to maintain all communications "***STRICTLY CONFIDENTIAL and ATTORNEY CLIENT PRIVILEGE***" so that "the other side cannot attack us for any reason"); *see also* Ex. Z (emails asserting "joint defense/common interest privilege").)

### D.    <u>Res Judicata Should Apply to Prevent Kroma EU From Unfairly Obtaining "Two Bites" at these Infringement Claims</u>.

This lawsuit represents Kroma EU's improper attempt at a second bite at the apple. The law of nonparty preclusion is intended to prevent this exact scenario, where Kroma EU is

relitigating claims that were prosecuted in a prior action *in which it participated*, and in which *its interests were admittedly represented*. The fact that Tillett allegedly did not share its settlement proceeds from the California Action with Kroma EU is of no moment. The existence of privity does not depend upon the outcome of the prior action, favorable or unfavorable (although the California Action plainly generated a favorable result). A person can be "adequately represented" for privity purposes even where the prior action failed. *See In re Collins*, 489 B.R. 917, 923 (S.D. Ga. 2012) ("'Adequately represented' does not mean 'successfully represented.'").

Here as well, Willey's dissatisfaction with the outcome of the California Action does not alter that she was in privity with Tillett due to the nature of their relationship under the License Agreement and Willey's participation in the California Action. If Tillett has outstanding damages that are unrecompensed, then her remedy is a contract claim against Tillett under the indemnity provision of section 4.3.3 of the License Agreement, which Kroma EU is in fact pursuing. (*See* Compl. ¶¶ 103 *et seq.*) Willey's dispute with Tillett over Tillett's handling of the settlement payment does not justify Kroma EU rehashing the previously adjudicated claims against Boldface and the Kardashians in hopes of obtaining a *double* recovery—namely, an award from Tillett of its share of the settlement payment and a duplicative award from Boldface and the Kardashians.

The Kardashians respectfully request the Court find that nonparty preclusion applies and grant summary judgment on this additional basis.[5]

## VI.   <u>CONCLUSION</u>

For all the reasons set forth above, the Kardashians respectfully request that their Motion for Summary Judgment be granted in its entirety.

---

[5]   This Court's prior Order found based on the pleadings alone that "the parties in the two lawsuits are not identical" and thus res judicata does not apply. *Kroma Makeup EU*, 2015 WL 1708757 *7. That Order does not preclude summary judgment, as the Court is now entitled to look beyond the four corners of the Complaint and consider the evidence presented here that Tillett and Kroma EU were in privity so as to warrant nonparty preclusion.

RESPECTFULLY SUBMITTED this 9th day of June 2017.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP

/s/ Michael J. Kump_____
Michael J. Kump, Esquire (*pro hac vice*)
Cal Bar No. 100983
mkump@kwikalaw.com
Jonathan Steinsapir, Esquire (*pro hac vice*)
Cal. Bar No. 226281
jsteinsapir@kwikalaw.com
Gregory Korn, Esquire (*pro hac vice*)
Cal. Bar No. 205306
gkorn@kwikalaw.com
808 Wilshire Boulevard, Third Floor
Santa Monica, CA 90401
Tel: (310) 566-9800
Fax: (310) 566-9884
*Admitted *Pro Hac Vice*

PEARSON BITMAN LLP

Ronnie J. Bitman, Esquire
Florida Bar No.: 0744891
rbitman@pearsonbitman.com
485 N. Keller Road, Suite 401
Maitland, Florida 32751
Telephone:  (407) 647-0090
Facsimile:  (407) 647-0092

*Attorneys for Defendants Kim Kardashian, Kourtney Kardashian and Khloe Kardashian*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of the foregoing via the CM/ECF system.

/s/Ronnie J. Bitman
Ronnie J. Bitman, Esquire
Florida Bar No. 0744891
rbitman@powellpearson.com
399 Carolina Ave., Suite 100
Winter Park, FL 32789
Telephone: (407) 647-5551
Facsimile: (407) 647-5551

Michael J. Kump, Esquire (*pro hac vice*)
Cal Bar No. 100983
mkump@kwikalaw.com
Jonathan Steinsapir, Esquire (*pro hac vice*)
Cal. Bar No. 226281
jsteinsapir@kwikalaw.com
Gregory Korn, Esquire (*pro hac vice*)
Cal. Bar No. 205306
gkorn@kwikalaw.com
808 Wilshire Boulevard, Third Floor
Santa Monica, CA 90401
Tel: (310) 566-9800
Fax: (310) 566-9884
*Admitted *Pro Hac Vice*

*Attorneys for Defendants Kim Kardashian, Kourtney Kardashian and Khloe Kardashian*

388252

27